**LAW OFFICE OF WAYNE A. SILVER**
Wayne A. Silver (108135)
643 Bair Island Road,
Suite 403
Redwood City, CA 94063
Phone: (650) 282-5970
Fax:    (650) 282-5980
Email: ws@waynesilverlaw.com

*Attorney for KENNETH Y. KAI and*
*TAE K. KAI, Trustees of the Kai Family 1998 Trust*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>MICHAEL HAROUTUN MIROYAN,<br><br>    Debtor. | Case No.: 18-52601-MEH<br>Chapter 13<br><br>RS No.: WS110<br><br> Date:  January 31, 2019<br>Time:  9:30 a.m.<br>Court:  3020, Hon. M. Elaine Hammond |

## SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE

    KENNETH Y. KAI and TAE K. KAI ("Movants"), Trustees of the Kai Family 1998 Trust

("Kai Trust") request the Court take judicial notice under Federal Rule of Evidence 201 of the

following pleadings and documents in Civil Action No. 15-1-0164K against *Hawaiian Riverbend,*

*LLC* in the Circuit Court of the Third Circuit State of Hawaii:

| Exhibit | Description |
|---|---|
| One | Amended Answer To Complaint, Affirmative Defenses, Counterclaims and Third-Party Complaint. |
| Two | Defendant/ Counterclaim Plaintiff Hawaiian Riverbend, LLC's Memorandum In Opposition To "Plaintiffs' Renewed Motion for Summary Judgment and for Interlocutory Decree Of Foreclosure" ; Declaration of Ryan Smith; Exhibits "A" - "J"; Certificate of Service |

    Under Fed. R. Evid. 201(d), judicial notice may be taken at any stage of a proceeding. The

Court may take judicial notice of any matter "not subject to reasonable dispute because it: (1) is

Supplemental Request for Judicial Notice

generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Courts may take judicial notice of proceedings in other courts. *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citing *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169 (10th Cir. 1979)) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'"). The contents of these filings are public records that are "not subject to reasonable dispute [and] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Dated: January 29, 2019

/s/ Wayne A. Silver
Wayne A. Silver, attorney for *KENNETH Y. KAI and TAE K. KAI, Trustees of the Kai Family 1998 Trust*

Supplemental Request for Judicial Notice

EXHIBIT 1

[Amended Answer to Complaint, Affirmative Defenses, Counterclaims and Third-Party Complaint]

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI 96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

FILED
CIRCUIT COURT OF
THE THIRD CIRCUIT
STATE OF HAWAII

2016 MAR 11 PM 3: 47

CLERK_____ L. CHINEN _____

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST,<br><br>    Plaintiff/<br>    Counterclaim<br>    Defendant,<br><br>  vs.<br><br><br>HAWAIIAN RIVERBEND, LLC,<br><br>    Defendant/<br>    Counterclaim<br>    Plaintiff,<br><br>  vs.<br><br>COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10,<br><br>    Defendants,<br><br>  vs.<br><br>KENNETH Y. KAI and TAE K. KAI, as individuals;<br><br>    Third-Party<br>    Defendants. | Civil No. 15-1-0164K<br>(Foreclosure)<br><br><br>**AMENDED ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY COMPLAINT; CERTIFICATE OF SERVICE**<br><br><br><br>Jury Trial Demanded<br><br><br>No Trial Date Set |

1

**AMENDED ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

**ANSWER**

COMES NOW the Defendant, HAWAIIAN RIVERBEND, LLC (hereinafter referred to as "Defendant"), by and through its attorney Paul J. Sulla, Jr., and in answer to Plaintiffs' Complaint states as follows:

1. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1.

2. Admit.

3. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3.

4. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4.

5. Deny. Defendant may technically be a Hawaii LLC but it is wholly owned and operated by a California resident. Because both Plaintiff and the de facto defendant are from California, and because there exists related counterclaims that arise in California, this matter may be better brought in federal court.

6.    Defendant denies paragraph 6 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

7.    Defendant denies paragraph 7 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

8.    Defendant denies paragraph 8 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

9.    Defendant denies paragraph 9 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

10.  Defendant denies paragraph 10 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences

and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

11. Deny.

12. Deny.

13. Defendant denies paragraph 13 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

14. Deny. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

15. Defendant denies paragraph 15 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

16. Defendant denies paragraph 16 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

17. Deny.

18. Deny.

19. Defendant denies paragraph 19 inasmuch as the documents referred to therein will speak for themselves. Except as expressly admitted herein, Defendant denies any inferences and/or legal conclusion contained in said paragraph and leaves the Plaintiffs to their proof.

20. No response necessary because this paragraph contains legal conclusions only.

21. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21.

22. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22.

23. Deny.

24. Defendant denies any and all allegations and claims not specifically admitted, including those in the Prayer for Relief.

WHEREFORE, Defendant respectfully requests that Plaintiff's complaint be dismissed.

### AFFIRMATIVE DEFENSES

### FIRST DEFENSE

1. The complaint fails to state a claim against Defendant upon which relief can be granted.

## SECOND DEFENSE

2.   The Complaint and any recovery thereunder is barred by the defenses of release and waiver.

## THIRD DEFENSE

3.   The Complaint and any recovery thereunder is barred by the defenses of accord and satisfaction.

## FOURTH DEFENSE

4.   The Complaint and any recovery thereunder is barred by the defenses of estoppel.

## FIFTH DEFENSE

5.   The Complaint and any recovery thereunder is barred by the defense of failure of consideration.

## SIXTH DEFENSE

6.   The Complaint and any recovery thereunder is barred by the statute of frauds.

## SEVENTH DEFENSE

7.   The Complaint and any recovery thereunder is barred by the defense of impossibility and related defenses.

## EIGHTH DEFENSE

8.   The Complaint and any recovery thereunder is barred by Plaintiffs' actions, which constitute unfair dealings, misrepresentations, retaliatory action, detrimental reliance, fraud, unclean hands, pari delicto, lack of good faith, unconscionability, and unavoidable consequences.

## NINTH DEFENSE

8. The Complaint and any recovery thereunder is barred by Plaintiffs' actions, which constitute unfair dealings, misrepresentations, retaliatory action, detrimental reliance, fraud, unclean hands, pari delicto, lack of good faith, unconscionability, and unavoidable consequences.

## TENTH DEFENSE

9. The Complaint and any recovery thereunder is barred by the defense of failure to mitigate damages caused solely by Plaintiff or others over whom Defendants had no control.

## ELEVENTH DEFENSE

10. The Complaint and any recovery thereunder is barred by the defense of set-off.

## TWELFTH DEFENSE

11. The Complaint and any recovery thereunder is barred by the defense of ambiguity.

## THIRTEENTH DEFENSE

12. The Complaint and any recovery thereunder is barred by the defense of the lack of proper notice.

## FOURTEENTH DEFENSE

13. The Complaint and any recovery thereunder is barred by the defense that acts or omissions of which Plaintiffs complains were caused by Plaintiffs and/or its agents or representatives.

## FIFTEENTH DEFENSE

14. Defendant gives notice of its intention to rely upon any other matter constituting an avoidance or affirmative defense as set forth in Rule 8(c) of the Hawaii Rules of Civil Procedure, and that they may amend their Answer following discovery and prior to the conclusion of trial on this matter.

## PRAYER FOR RELIEF

WHEREFORE, Defendant prays as follows:

1. That the Complaint against Defendant be dismissed with prejudice;

2. That this court award Defendant its reasonable costs, and reasonable attorney's fees incurred herein; and

3. That the Court awards such other and further relief as the Court may deem just and proper.

DATED: Hilo, Hawaii this ___ day of March 11, 2016.

_____
PAUL J. SULLA, JR.
Attorney for Defendant
HAWAIIAN RIVERBEND LLC

## JURY DEMAND

Defendant hereby demands a jury trial in the above case.


DATED:  Hilo, Hawaii this ___ day of March, 2016.

_____
PAUL J. SULLA
Attorney for Defendant
HAWAIIAN RIVERBEND LLC

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI 96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST,<br><br>     Plaintiff/<br>     Counterclaim<br>     Defendant,<br><br>  vs.<br><br><br>HAWAIIAN RIVERBEND, LLC,<br><br>     Defendant/<br>     Counterclaim<br>     Plaintiff,<br><br>  vs.<br><br>COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10,<br><br>     Defendants,<br><br>  vs.<br><br>KENNETH Y. KAI and TAE K. KAI, as individuals;<br><br>     Third-Party<br>     Defendants. | Civil No. 15-1-0164K<br>(Foreclosure)<br><br><br>**COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**<br><br><br><br>Jury Trial Demanded<br><br><br>No Trial Date Set |

**DEFENDANT HAWAIIAN RIVERBEND LLC'S COUNTERCLAIMS AND THIRD-PARTY COMPLAINT AGAINST PLAINTIFFS KENNETH KAI and TAE KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST**

COMES NOW the Defendant and Counterclaim Plaintiff herein, HAWAIIAN RIVERBEND LLC (hereinafter "HAWAIIAN RIVERBEND") by and through its attorney Paul J. Sulla, Jr., and for its Counter- and Third-Party Complaint against KENNETH KAI and TAE KAI, Individually and as TRUSTEES OF THE KAI FAMILY 1998 TRUST (hereinafter "KAI TRUST") states as follows:

### JURISDICTION/ PARTIES

1.     At all times relevant herein, Counterclaim Plaintiff, HAWAIIAN RIVERBEND LLC was a Hawaii Limited Liability Company.

2.     The real estate located at TMK (3)6-8-002-053(Lot 9-C) contains an area of 14.6 acres, more or less (hereinafter referred to as "Subject Property"), is the subject of this litigation.

3.     Counter-Defendants KENNETH KAI and TAE KAI are a married couple residing in California.  They are being sued herein as individuals and as Trustee for THE KAI FAMILY 1998 TRUST.

4.     Counter-Defendant THE KAI FAMILY 1998 TRUST is, upon Counterclaim Plaintiff's information and belief, a trust located in California.

5.     All persons or mortgage trusts unknown claiming any legal or equitable right, title estate, lien or interest in the

property or HAWAIIAN RIVERBEND's Mortgage Loan Promissory Note described in this Complaint adverse to HAWAIIAN RIVERBEND's title thereto and as DOES 1 through 100 (hereinafter referred to as "UNKNOWN DEFENDANTS") are unknown to Plaintiff. These unknown Defendants and each of them, claim some right, title, estate, lien or interest in the Subject Property hereinafter described adverse to HAWAIIAN RIVERBEND's title, and their claims and each of them constitute a cloud on HAWAIIAN RIVERBEND's title to the Subject Property. HAWAIIAN RIVERBEND is informed and believes, and on that basis alleges, that each fictitiously named DOE Defendant is responsible for the events hereinafter alleged. HAWAIIAN RIVERBEND will seek leave of the Court to amend this Complaint to allege the true names and capacities of said fictitiously named DOE Defendants when ascertained.

6. HAWAIIAN RIVERBEND is informed, believe and therefore allege that at all times mentioned herein, the UNKNOWN DEFENDANTS were individuals and/or business entities, whose forms are unknown and were agents, principals, employees, employers and/or co-conspirators of each and every other named or unnamed Defendant in this Complaint. HAWAIIAN RIVERBEND is informed, believe and therefore allege that each of said Defendants are and at all relevant times herein was, acting within the scope and consent of the remaining named and unnamed Defendants.

7.   The Property which is the subject of this Complaint is located in Hawaii County, Hawaii but the actual communications, transactions, and incidents at issue in this Complaint took place in California.

8.   This Complaint is for injunctive and declaratory relief and damages pursuant to HRS 667 et seq., HRS 480:2, and Hawaii common law.

9.   Jurisdiction and Venue is proper in the Circuit Court of the Third Circuit for the State of Hawaii, in that all parties systematically conduct and transact substantial business in this State and HAWAIIAN RIVERBEND is a Hawaii LLC.   However, some of the causes of action arose in California.

## FACTUAL ALLEGATIONS

10.   HAWAIIAN RIVERBEND incorporates by reference all preceding paragraphs as if set forth herein.

11.   This Complaint involves a dispute over title to the subject real property located at Waikoloa Road and Paniolo Road in Hawaii County at TMK 6-8-002-053 (the "Subject Property").

12.   HAWAIIAN RIVERBEND Hawaiian Riverbend LLC was registered as a Hawaii Limited Liability Company on July 14, 2005.   It is currently a single member LLC wholly owned and operated by California resident Michael Miroyan ("Mr. Miroyan") who has served as the Managing Member of HAWAIIAN RIVERBEND since July 14, 2005.

13.    On or around May 3, 2010 the KAI TRUST and HAWAIIAN RIVERBEND executed a Promissory Note for $540,000 with 5% interest rate (hereinafter "First Note").

14.    The First Note included $180,000 of pre-paid interest. The actual cash received by Hawaiian Riverbend LLC was approximately $330,000.00.

15.    The First Note was provided for an overstated principle amount and thus it contains hidden interest.  This hidden interest, once identified and calculated, is at a rate that far exceeds the 12% allowable rate under Hawaii usury laws. The lender's intent to avoid the civil and criminal penalties for usury is what causes such interest to become hidden.

16.    On or around April 28, 2010 a Real Property Mortgage was executed between the KAI TRUST and HAWAIIAN RIVERBEND, encumbering 31.3 acres of TMK #6-8-02-21 (hereinafter the "Original Lot"), owned by HAWAIIAN RIVERBEND, securing the First Note (hereinafter "Original Mortgage").  This document was recorded as Doc. No. 2010-062606 in the Hawaii Bureau of Conveyances.

17. By virtue of a prior Membership Purchase Agreement between the KAI TRUST and HAWAIIAN RIVERBEND wherein the KAI TRUST purchased a 50% membership interest in HAWAIIAN RIVERBEND, and upon execution of the First Note and Mortgage in 2010, the KAI TRUST became simultaneously members of HAWAIIAN RIVERBEND

and the first mortgage holder on 31.3 acres of TMK #6-8-02-21 prior to its subdivision in to three parcels which occurred on February 13, 2013 with Hawaii County Counsel approval. The Subject Property is one of these three parcels that this original lot was subdivided into.

18. Pursuant to the Membership Purchase Agreement signed by the KAI TRUST, HAWAIIAN RIVERBEND made various capital calls upon the KAI TRUST which they were obligated to meet. The KAI TRUST failed to provide the capital that they promised to provide HAWAIIAN RIVERBEND pursuant to the Membership Purchase Agreement and yet still retained a 50% ownership. HAWAIIAN RIVERBEND granted the KAI TRUST an interest in the Original Lot based on its promise to fund HAWAIIAN RIVERBEND with the capital needed to develop the lot.

19. The KAI TRUST did not provide the HAWAIIAN RIVERBEND LLC with the capital that it promised it would, which was the consideration for HAWAIIAN RIVERBEND signing the First Note and the Original Mortgage.

20. On July 13, 2012 a Capital Call by HAWAIIAN RIVERBEND for $12,500 by its Manager, Mike Miroyan, went unfunded.

21. The records of this July 13, 2012 Capital Call shows that HAWAIIAN RIVERBEND's Manager became suspicious of the KAI TRUST's intentions in breaching its agreement and realized that its grant of the First Note and Original Mortgage to the KAI

15

TRUST made in good faith based upon the promise of future capital contributions by them to HAWAIIAN RIVERBEND might be abused.

22. Mr. Miroyan expressed his concerns on the face of the July 13, 2012 Capital Call wherein he states: "As you know you have a note due in May 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share [of] $12,500 into the [HAWAIIAN RIVERBEND Bank of America Account] today."

23. A subsequent capital call made by HAWAIIAN RIVERBEND (pursuant to its agreement with the KAI TRUST) on September 11, 2012 also went unfunded.

24. The KAI TRUST received the First Note and Original Mortgage for $540,000 based upon its execution of the HAWAIIAN RIVERBEND Membership Purchase Agreement wherein it agreed to provide at least $540,000 in cash to fund the LLC so that it could operate.

25. Instead of providing the funds that it promised, the KAI TRUST provided only $31,000 to HAWAIIAN RIVERBEND.[1] This significant undercapitalization of HAWAIIAN RIVERBEND undermined the LLC's effectiveness, hampered proper development of the

---

[1] Check # 4746 dated Dec. 19, 2011 for $25,000; Check #4921 dated March 10, 2012 for $3,000 and Check #5047 dated May 11, 2012 for $3,000.

Original Lot (hereinafter "The Project"), and soured the relationship between the parties.

26. When HAWAIIAN RIVERBEND confronted the KAI TRUST about its breach of agreement and the debilitating effect their lack of funding was having on The Project, the KAI TRUST and HAWAIIAN RIVERBEND executed an additional agreement on January 11, 2013 wherein the KAI TRUST agreed to provide $69,000 to HAWAIIAN RIVERBEND over a four month period. However, only $20,000 was actually provided by check dated January 11, 2013.

27. On June 2, 2013, Mr. Miroyan sent the Trustees of the KAI TRUST an e-mail wherein he documents that the amounts that the KAI TRUST promised to provide to HAWAIIAN RIVERBEND still had not been paid. Specifically a Capital Call from September 2012 to pay Sydney Fuke, Planning Consultant, and property taxes on the Original Lot, remained unpaid.

28. At the time, on June 2, 2013, the KAI TRUST had not paid HAWAIIAN RIVERBEND any payments for over a year and had been in breach of its Membership Purchase Agreement with the KAI TRUST for over a year.

29. The KAI TRUST also withheld copies of the First Note from HAWAIIAN RIVERBEND, which was indicative of its bad faith intent.

30. Based on the above promises, inducements, agreements, and representations on the part of the KAI TRUST, HAWAIIAN

17

RIVERBEND executed a First Amendment of Real Property Mortgage on or around March 1, 2013 to update the legal description of the Original Parcel to include the Subject Property.

31. On or around June 2013 the KAI TRUST entered into a new Membership Purchase Agreement for HAWAIIAN RIVERBEND Membership Units wherein it sold all of its Membership Interest in the LLC to Mr. Miroyan in exchange for a new promissory note and mortgage. This new note referenced in the June 2013 agreement increased the prior note amount by $300,000 to $840,000 and encumbered the Subject Property.

32. Based on the above agreements, on July 15, 2013 the KAI TRUST executed a "Partial Release of Mortgage" recorded in the Hawaii Bureau of Conveyances on August 8, 2013 wherein most of the encumbrance on the Original Parcel [pre-subdivision TMK No. (3) 6-8-002-021] was released in the form of a release of two of the three parcels created from the subdivision of the original parcel [TMK No. (3) 6-8-02-052, designated to become a County Park; and TMK No. (3) 6-8-02-021 a 5.95 acre Ag5 lot].

33. The only parcel that did not obtain a mortgage release was the Subject Property, TMK NO. 6-8-02-053 which is 14.6 acres zoned commercially, future site of a planned commercial village with significant economic value.

34. On or around August, 2013 the KAI TRUST and Mr. Miroyan entered into an agreement entitled "Hawaiian Riverbend

LLC Amendment to Operating Agreement" wherein the parties agreed that the $840,000 Note (hereinafter the "New Note") would be paid down from the "net proceed of the sale of parcel 21", which is a 5.95 acre parcel at TMK(1)6-8-002-021.  This parcel is not the Subject Property.

35.   This increase in the First Note from $540,000 to $840,000 occurred without the KAI TRUST providing any consideration.  No funds were provided from the KAI TRUST, despite a promise by the KAI TRUST to provide additional funds.

36.   The reason why the KAI TRUST did not have to provide any cash upfront in exchange for the promissory notes is because the amounts were due as the expenses were incurred during the subdivision of the Original Parcel and development of the Subject Property.  For example, there existed an agreement for funding to be provided by the KAI TRUST pursuant to their agreement to fund on an as needed basis after the construction drawings were done, bids received, another joint venture partner found, and the bank approved a loan.

37.   When the KAI TRUST became aware that HAWAIIAN RIVERBEND Manager Mr. Miroyan had been distracted by a different and unrelated civil lawsuit which put him in financial distress, the Trustees of the KAI TRUST took advantage of Mr. Miroyan and HAWAIIAN RIVERBEND's vulnerability to breach their agreements to provide funding.

38.   The KAI TRUST breached every aspect of its business arrangement with HAWAIIAN RIVERBEND.

39.   The KAI TRUST procured the New Note by fraud and deceit.

40.   The KAI TRUST purposefully kept HAWAIIAN RIVERBEND underfunded in breach of their agreement with HAWAIIAN RIVERBEND in order to take advantage of HAWAIIAN RIVERBEND by bringing its foreclosure Complaint herein and knowing that HAWAIIAN RIVERBEND would not have sufficient funding to obtain counsel to defend itself, thereby reaping a windfall based on sums allegedly owed that the KAI TRUST never actually paid.

41.   The KAI TRUST delayed the partial release of mortgage that it agreed to execute and interfered with the escrow process during the sale of the released parcels intentionally to further weaken HAWAIIAN RIVERBEND financially.

42.   The ultimate plan for the Development Project on the Subject Property was to create a shopping center.

43.   The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid off through the profits from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

## FIRST CAUSE OF ACTION

### Breach of Contract – LLC Membership Agreement
(Against KENNETH Y. KAI and TAE K. KAI as TRUSTEES OF THE KAI
FAMILY 1998 TRUST)

44. HAWAIIAN RIVERBEND hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth herein.

45. HAWAIIAN RIVERBEND and the KAI TRUST entered into a certain Membership Purchase Agreement wherein the KAI TRUST purchased a 50% membership interest in HAWAIIAN RIVERBEND, and upon execution of the First Note and Mortgage in 2010, the KAI TRUST became simultaneously members of HAWAIIAN RIVERBEND and the first mortgage holder on 31.3 acres of TMK #6-8-02-21 prior to its subdivision in to three parcels which occurred on February 13, 2013 with Hawaii County Counsel approval.

46. Pursuant to the Membership Purchase Agreement signed by the KAI TRUST, HAWAIIAN RIVERBEND made various capital calls upon the KAI TRUST which they were obligated to meet. The KAI TRUST failed to provide the capital that they promised to provide HAWAIIAN RIVERBEND pursuant to the Membership Purchase Agreement and yet still retained a 50% ownership. HAWAIIAN RIVERBEND granted the KAI TRUST an interest in the Original Lot based on its promise to fund HAWAIIAN RIVERBEND with the capital needed to develop the lot.

47. The KAI TRUST did not provide the HAWAIIAN RIVERBEND LLC with the capital that it promised it would, which was the

consideration for HAWAIIAN RIVERBEND signing the First Note and the Original Mortgage and allowing this encumbrance to be placed on the Original Parcel.

48. On July 13, 2012 a Capital Call by HAWAIIAN RIVERBEND for $12,500 by its Manager, Mike Miroyan, went unfunded.

49. The records of this July 13, 2012 Capital Call shows that HAWAIIAN RIVERBEND's Manager became suspicious of the KAI TRUST's intentions in breaching its agreement and realized that its grant of the First Note and Original Mortgage to the KAI TRUST made in good faith based upon the promise of future capital contributions by them to HAWAIIAN RIVERBEND might be abused.

50. Mr. Miroyan expressed his concerns on the face of the July 13, 2012 Capital Call wherein he states: "As you know you have a note due in May 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share [of] $12,500 into the [HAWAIIAN RIVERBEND Bank of America Account] today."

51. A subsequent capital call made by HAWAIIAN RIVERBEND (pursuant to its agreement with the KAI TRUST) on September 11, 2012 also went unfunded.

52. The KAI TRUST received the First Note and Original Mortgage for $540,000 based upon its execution of the HAWAIIAN

RIVERBEND Membership Purchase Agreement wherein it agreed to provide at least $540,000 in cash to fund the LLC so that it could operate.

53. Instead of providing the funds that it promised, the KAI TRUST provided only $31,000 to HAWAIIAN RIVERBEND.[2] This significant undercapitalization of HAWAIIAN RIVERBEND undermined the LLC's effectiveness, hampered proper development of the Original Lot (hereinafter "The Project"), and soured the relationship between the parties.

54. When HAWAIIAN RIVERBEND confronted the KAI TRUST about its breach of agreement and the debilitating effect their lack of funding was having on The Project, the KAI TRUST and HAWAIIAN RIVERBEND executed an additional agreement on January 11, 2013 wherein the KAI TRUST agreed to provide $69,000 to HAWAIIAN RIVERBEND over a four month period. However, only $20,000 was actually provided by check dated January 11, 2013.

55. On June 2, 2013, Mr. Miroyan sent the Trustees of the KAI TRUST an e-mail wherein he documents that the amounts that the KAI TRUST promised to provide to HAWAIIAN RIVERBEND still had not been paid. Specifically a Capital Call from September 2012 to pay Sydney Fuke, Planning Consultant, and property taxes on the Original Lot, remained unpaid.

---

[2] Check # 4746 dated Dec. 19, 2011 for $25,000; Check #4921 dated March 10, 2012 for $3,000 and Check #5047 dated May 11, 2012 for $3,000.

56. At the time, on June 2, 2013, the KAI TRUST had not paid HAWAIIAN RIVERBEND any payments for over a year and had been in breach of its Membership Purchase Agreement with the KAI TRUST for over a year.

57. HAWAIIAN RIVERBEND was severely damaged by the KAI TRUST's breach of their agreement. The ultimate plan for the Development Project on the Subject Property was to create a shopping center.

58. The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid off through the profits from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

59. Instead of profiting from what should have been a very profitable development project, HAWAIIAN RIVERBEND is now spending its meager cash reserves on defending itself from a foreclosure action from the KAI TRUST herein which is being brought wrongfully and without right and in breach of its agreement with HAWAIIAN RIVERBEND.

60. The KAI TRUST has failed to fully comply with its promises, representations and obligations to HAWAIIAN RIVERBEND to provide capital to HAWAIIAN RIVERBEND.

WHEREFORE, HAWAIIAN RIVERBEND pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### Breach of Contract – Second Agreement

(Against KENNETH Y. KAI and TAE K. KAI as TRUSTEES OF THE KAI FAMILY 1998 TRUST)

61.  HAWAIIAN RIVERBEND hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth herein.

62.  When HAWAIIAN RIVERBEND confronted the KAI TRUST about its breach of agreement (detailed above) and the debilitating effect its lack of funding was having on The Project, the KAI TRUST and HAWAIIAN RIVERBEND executed an additional agreement on January 11, 2013 wherein the KAI TRUST agreed to provide $69,000 to HAWAIIAN RIVERBEND over a four month period.  However, only $20,000 was actually provided by check dated January 11, 2013.

63.  On June 2, 2013, Mr. Miroyan sent the Trustees of the KAI TRUST an e-mail wherein he documents that the amounts that the KAI TRUST promised to provide to HAWAIIAN RIVERBEND still had not been paid.  Specifically a Capital Call from September 2012 to pay Sydney Fuke, Planning Consultant, and property taxes on the Original Lot, remained unpaid.

64.  At the time, on June 2, 2013, the KAI TRUST had not paid HAWAIIAN RIVERBEND any payments for over a year and had been in breach of its Membership Purchase Agreement with the KAI TRUST for over a year.

65. HAWAIIAN RIVERBEND was severely damaged by the KAI TRUST's breach of their agreement. The ultimate plan for the Development Project on the Subject Property was to create a shopping center.

66. The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid off through the profits from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

67. Instead of profiting from what should have been a very profitable development project, HAWAIIAN RIVERBEND is now financially damaged and is spending its meager cash reserves on defending itself from a foreclosure action from the KAI TRUST herein which is being brought wrongfully and without right and in breach of its agreement with HAWAIIAN RIVERBEND.

68. The KAI TRUST has failed to fully comply with its promises, representations and obligations to HAWAIIAN RIVERBEND to provide capital to HAWAIIAN RIVERBEND.

WHEREFORE, HAWAIIAN RIVERBEND pray for relief as set forth below.

## THIRD CAUSE OF ACTION

### Conversion

(Against KENNETH Y. KAI and TAE K. KAI individually and as
TRUSTEES OF THE KAI FAMILY 1998 TRUST)

69.  HAWAIIAN RIVERBEND hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth herein.

70.  Upon HAWAIIAN RIVERBEND's information and belief, the KAI TRUST received income from the Property and/or will receive income from the Property in the event that its foreclosure claim herein is successful, that it converted for its own use and did not provide to HAWAIIAN RIVERBEND, despite the fact that HAWAIIAN RIVERBEND had a legal right to these proceeds, which represent the amount that the KAI TRUST agreed to invest in HAWAIIAN RIVERBEND but didn't.

71. In doing the foregoing acts, the KAI TRUST acted with malice, fraud and oppression, and its acts were despicable and the KAI TRUST therefore is entitled to punitive damages.

WHEREFORE, HAWAIIAN RIVERBEND pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Unfair Competition/ Unfair Trade Practices
### (HRS 480:2)
(Against KENNETH Y. KAI and TAE K. KAI individually and as
TRUSTEES OF THE KAI FAMILY 1998 TRUST)

72. HAWAIIAN RIVERBEND re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

73. KENNETH Y. KAI and TAE K. KAI, as individuals and as TRUSTEES OF THE KAI FAMILY 1998 TRUST are primarily real estate investors who invest heavily in real estate in the western U.S., mostly in California.

74. HAWAIIAN RIVERBEND and its Managing Member Mike Miroyan are also primarily real estate investors who invest heavily in real estate in the western U.S., mostly in California.

75. Because both HAWAIIAN RIVERBEND and KENNETH Y. KAI and TAE K. KAI, as individuals and as TRUSTEES OF THE KAI FAMILY 1998 TRUST are engaged in the same commercial activity in the same markets, they are competitors within the meaning of Chapter 480, Hawaii Revised Statutes.

76. HAWAIIAN RIVERBEND is specifically in the class of persons that this law was designed to protect.

77. The KAI TRUST did have knowledge of material facts, circumstances and benefits, namely that: (1) the Subject Property could not be developed as planned without the funding

that they promised to HAWAIIAN RIVERBEND; (2) that their Mortgage encumbering the Property would greatly reduce the equity value of the Property; and (3) that the KAI TRUST's representation that it would invest the cash necessary for subdivision of the Original Parcel and development of the Subject Property was greatly exaggerated and it never intended to pay the amounts it promised and agreed to pay to HAWAIIAN RIVERBEND.  Despite this knowledge, the KAI TRUST failed to disclose these facts to HAWAIIAN RIVERBEND

78.  Without informing HAWAIIAN RIVERBEND that it would not actually invest the sums promised, the KAI TRUST improperly, unfairly, and illegally manipulated HAWAIIAN RIVERBEND into executing the First Note and the Subject Promissory Note in its favor and encumbering the Subject Property and the Original Parcel via a mortgage by actively misrepresenting that it would only seek repayment after the Property was developed and had sufficient equity to pay back the sums that it promised to provide to HAWAIIAN RIVERBEND.

79.  HAWAIIAN RIVERBEND is informed, believes and therefore alleges that the KAI TRUST knew, or should have known that HAWAIIAN RIVERBEND would not have signed the promissory notes and mortgages or allowed the KAI TRUST to obtain any membership interest in HAWAIIAN RIVERBEND had the KAI TRUST disclosed the

actual cash amount that they would ultimately be providing HAWAIIAN RIVERBEND.

80. By reason of the KAI TRUST's anti-competitive, fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, the KAI TRUST has engaged in unfair methods of competition in the conduct of trade and/or commerce actionable under HRS Sec.480-2 that were designed to deprive HAWAIIAN RIVERBEND of its income and equity in the Property, as well as its past and future investment.

81. HAWAIIAN RIVERBEND suffered significant loss. It invested tens of thousands of dollars that it wouldn't have otherwise invested of its own monies in order to move the development project forward. It is also facing foreclosure herein from the KAI TRUST which will deprive it of a substantial amount of equity and the Subject Property itself.

82. By reason of the foregoing, HAWAIIAN RIVERBEND has suffered and continues to suffer damages in a sum which is as yet unascertained.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

(Against KENNETH Y. KAI and TAE K. KAI individually and as
TRUSTEES OF THE KAI FAMILY 1998 TRUST)

83. Prior the foreclosure being sought herein against HAWAIIAN RIVERBEND, it enjoyed a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there was a reasonable probability of it maturing into a future economic benefit to HAWAIIAN RIVERBEND because HAWAIIAN RIVERBEND had already subdivided the Original Parcel which is commercially zones and ideally situated for commercial development and HAWAIIAN RIVERBEND held significant equity in the Subject Property.

84. The KAI TRUST had knowledge of the advantage or expectancy by HAWAIIAN RIVERBEND in that it was a prior member of HAWAIIAN RIVERBEND and its primary business partner.

85. The KAI TRUST had a purposeful intent to interfere with the relationship, advantage, or expectancy between HAWAIIAN RIVERBEND, the County of Hawaii, and the likely purchasers of the Subject Property.

86. By failing to comply with its financial obligations to HAWAIIAN RIVERBEND and by initiating its foreclosure Complaint against HAWAIIAN RIVERBEND in a manner that is compliant with the agreements and expectations between the parties, the KAI

31

TRUST interfered with and continues to interfere with and impair the relationship, advantage, or expectancy between HAWAIIAN RIVERBEND, the County of Hawaii, and the likely purchasers of the Subject Property in that HAWAIIAN RIVERBEND was unable to receive the benefit of the bargain that they struck in signing the above-referenced agreements with the KAI TRUST.

87. As a result of the KAI TRUST's tortious interference with HAWAIIAN RIVERBEND's prospective economic advantage in their interaction with the County of Hawaii, and the likely purchasers of the Subject Property, HAWAIIAN RIVERBEND suffered and will imminently suffer actual damages. It already lost must of its equity in the Subject Property and will likely lose all equity in the Subject Property upon foreclosure and also the right to use and enjoy the Subject Property.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

**SIXTH CAUSE OF ACTION**
**Fraud**
(Misrepresentation, Inducement, and Omission of Material Facts)
(Against KENNETH Y. KAI and TAE K. KAI individually and as
TRUSTEES OF THE KAI FAMILY 1998 TRUST)

88. HAWAIIAN RIVERBEND re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

89. On or around May 3, 2010 the KAI TRUST and HAWAIIAN RIVERBEND executed a Promissory Note for $540,000 with 5% interest rate (hereinafter "First Note").

90. On or around April 28, 2010 a Real Property Mortgage was executed between the KAI TRUST and HAWAIIAN RIVERBEND, encumbering 31.3 acres of TMK #6-8-02-21 (hereinafter the "Original Lot"), owned by HAWAIIAN RIVERBEND, securing the First Note (hereinafter "Original Mortgage"). This document was recorded as Doc. No. 2010-062606 in the Hawaii Bureau of Conveyances.

91. By virtue of a prior Membership Purchase Agreement between the KAI TRUST and HAWAIIAN RIVERBEND wherein the KAI TRUST purchased a 50% membership interest in HAWAIIAN RIVERBEND, and upon execution of the First Note and Mortgage in 2010, the KAI TRUST became simultaneously members of HAWAIIAN RIVERBEND and the first mortgage holder on 31.3 acres of TMK #6-8-02-21 prior to its subdivision in to three parcels which occurred on February 13, 2013 with Hawaii County Counsel approval. The Subject Property is one of these three parcels that this original lot was subdivided into.

92. Pursuant to the Membership Purchase Agreement signed by the KAI TRUST, HAWAIIAN RIVERBEND made various capital calls upon the KAI TRUST which they were obligated to meet. The KAI TRUST failed to provide the capital that they promised to

provide HAWAIIAN RIVERBEND pursuant to the Membership Purchase Agreement and yet still retained a 50% ownership. HAWAIIAN RIVERBEND granted the KAI TRUST an interest in the Original Lot based on its promise to fund HAWAIIAN RIVERBEND with the capital needed to develop the lot.

93. The KAI TRUST did not provide the HAWAIIAN RIVERBEND LLC with the capital that it promised it would, which was the consideration for HAWAIIAN RIVERBEND signing the First Note and the Original Mortgage.

94. On July 13, 2012 a Capital Call by HAWAIIAN RIVERBEND for $12,500 by its Manager, Mike Miroyan, went unfunded.

95. The records of this July 13, 2012 Capital Call shows that HAWAIIAN RIVERBEND's Manager became suspicious of the KAI TRUST's intentions in breaching its agreement and realized that its grant of the First Note and Original Mortgage to the KAI TRUST made in good faith based upon the promise of future capital contributions by them to HAWAIIAN RIVERBEND might be abused.

96. Mr. Miroyan expressed his concerns on the face of the July 13, 2012 Capital Call wherein he states: "As you know you have a note due in May 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share [of]

$12,500 into the [HAWAIIAN RIVERBEND Bank of America Account] today."

97.   The KAI TRUST also withheld copies of the First Note from HAWAIIAN RIVERBEND, which was indicative of its bad faith intent.

98.   Based on the above promises, inducements, agreements, and representations on the part of the KAI TRUST, HAWAIIAN RIVERBEND executed a First Amendment of Real Property Mortgage on or around March 1, 2013 to update the legal description of the Original Parcel to include the Subject Property.

99.   On or around June 2013 the KAI TRUST entered into a new Membership Purchase Agreement for HAWAIIAN RIVERBEND Membership Units wherein it sold all of its Membership Interest in the LLC to Mr. Miroyan in exchange for a new promissory note and mortgage.   This new note referenced in the June 2013 agreement increased the prior note amount by $300,000 to $840,000 and encumbered the Subject Property.

100. Based on the above agreements, on July 15, 2013 the KAI TRUST executed a "Partial Release of Mortgage" recorded in the Hawaii Bureau of Conveyances on August 8, 2013 wherein most of the encumbrance on the Original Parcel was released but fraudulently delayed execution of this release to the substantial detriment of HAWAIIAN RIVERBEND.

101. On or around August, 2013 the KAI TRUST and Mr. Miroyan entered into an agreement entitled "Hawaiian Riverbend LLC Amendment to Operating Agreement" wherein the parties agreed that the $840,000 Note (hereinafter the "New Note") would be paid down from the "net proceed of the sale of parcel 21", which is a 5.95 acre parcel at TMK(1)6-8-002-021. This parcel is not the Subject Property.

102. This increase in the First Note from $540,000 to $840,000 occurred without the KAI TRUST providing any consideration. No funds were provided from the KAI TRUST, despite a promise by the KAI TRUST to provide additional funds.

103. The reason why the KAI TRUST did not have to provide any cash upfront in exchange for the promissory notes is because they fraudulently stated that they would provide the amounts due as the expenses were incurred during the subdivision of the Original Parcel and development of the Subject Property. For example, there existed an agreement for funding to be provided by the KAI TRUST pursuant to their agreement to fund on an as needed basis after the construction drawings were done, bids received, another joint venture partner found, and the bank approved a loan.

104. When the KAI TRUST became aware that HAWAIIAN RIVERBEND was severely undercapitalized and that Mr. Miroyan had been distracted by a different and unrelated civil lawsuit which

put him in financial distress, the Trustees of the KAI TRUST took advantage of Mr. Miroyan and HAWAIIAN RIVERBEND's vulnerability to breach their agreements to provide funding.

105. The KAI TRUST intended to breached every aspect of its business arrangement with HAWAIIAN RIVERBEND, and this business arrangement was created through its fraudulent representation that it would take care of the project expenses.

106. As such, The KAI TRUST procured the New Note by fraud and deceit.

107. The KAI TRUST purposefully kept HAWAIIAN RIVERBEND underfunded in breach of their agreement with HAWAIIAN RIVERBEND in order to take advantage of HAWAIIAN RIVERBEND by bringing its foreclosure Complaint herein and knowing that HAWAIIAN RIVERBEND would not have sufficient funding to obtain counsel to defend itself, thereby reaping a windfall based on sums allegedly owed that the KAI TRUST never actually paid.

108. The KAI TRUST delayed the partial release of mortgage that it agreed to execute and interfered with the escrow process during the sale of the released parcels intentionally to further weaken HAWAIIAN RIVERBEND financially.

109. The ultimate plan for the Development Project on the Subject Property was to create a shopping center.

110. The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid

off through the profits from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

111. As a result, HAWAIIAN RIVERBEND has suffered damages as a result of the fraud, misrepresentations, and omissions of the KAI TRUST in an amount that can only be determined at trial or upon the sale of the Property.

112. The KAI TRUST knew, or should have known that the HAWAIIAN RIVERBEND would not have continued to proceed with its development plans for the Original Parcel and the Subject Property had the KAI TRUST disclosed their intent to not fund the Property's development as promised and yet to foreclose on the Subject Property anyway.

113. The KAI TRUST has profited and will profit further upon foreclosure from deceptively preying upon the HAWAIIAN RIVERBEND to its great detriment.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel
(Against KENNETH Y. KAI and TAE K. KAI individually and as
TRUSTEES OF THE KAI FAMILY 1998 TRUST)

114. HAWAIIAN RIVERBEND re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

115. HAWAIIAN RIVERBEND justifiably relied on the Trustees of the KAI TRUST's verbal and written statements to it on more than one occasion that it would provide the funds necessary for project completion and would not foreclose but instead await payment of the amounts due on the Promissory Note from the proceeds of the sale of a different parcel.

116. HAWAIIAN RIVERBEND's reliance was reasonable because a written agreement to this effect had been presented to it and the KAI TRUST is a sophisticated entity with significant assets held in the form of real estate in California and the parties had a long-standing business relationship in both Hawaii and California.

117. HAWAIIAN RIVERBEND's reliance was to its substantial economic detriment, as it passed up other opportunities, including using its existing equity to obtain other financing or attract other development partners.

118. HAWAIIAN RIVERBEND did not know and could not know that the KAI TRUST's statements were false and misleading.

119. The KAI TRUST did see and should have reasonably foreseen that HAWAIIAN RIVERBEND relied and would rely upon its Trustee's statements.

120. Under the facts and circumstances of this case, justice requires the enforcement of the KAI TRUST's promises and representations to HAWAIIAN RIVERBEND that no foreclosure would occur but instead it would await payment (of any amounts actually due and owing) from the sale of a separate but otherwise unrelated parcel owned by HAWAIIAN RIVERBEND.

121. HAWAIIAN RIVERBEND is entitled to an order requiring KAI TRUST to take such actions as are necessary to make good on their promise to invest, to dismiss its foreclosure complaint herein, as well as compensation for actual damages.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

### EIGHTH CAUSE OF ACTION

### (Breach of Contract – Third Agreement)

(Against KENNETH Y. KAI and TAE K. KAI as TRUSTEES OF THE KAI FAMILY 1998 TRUST)

122. HAWAIIAN RIVERBEND hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth herein.

123. On or around June 2013 the KAI TRUST entered into a new Membership Purchase Agreement for HAWAIIAN RIVERBEND Membership Units wherein it sold all of its Membership Interest in the LLC to Mr. Miroyan in exchange for a new promissory note

and mortgage. This new note referenced in the June 2013 agreement increased the prior note amount by $300,000 to $840,000 and encumbered the Subject Property.

124. Based on the above agreement, on July 15, 2013 the KAI TRUST executed a "Partial Release of Mortgage" recorded in the Hawaii Bureau of Conveyances on August 8, 2013 wherein most of the encumbrance on the Original Parcel was released.

125. On or around August, 2013 the KAI TRUST and Mr. Miroyan entered into a supplemental agreement entitled "Hawaiian Riverbend LLC Amendment to Operating Agreement" wherein the parties agreed that the $840,000 Note (hereinafter the "New Note") would be paid down from the "net proceed of the sale of parcel 21", which is a 5.95 acre parcel at TMK(1)6-8-002-021. This parcel is not the Subject Property.

126. This increase in the First Note from $540,000 to $840,000 occurred without the KAI TRUST providing any consideration. No funds were provided from the KAI TRUST, despite a promise by the KAI TRUST to provide additional funds.

127. The reason why the KAI TRUST did not have to provide any cash upfront in exchange for the promissory notes is because the amounts were due as the expenses were incurred during the subdivision of the Original Parcel and development of the Subject Property. For example, there existed an agreement for funding to be provided by the KAI TRUST pursuant to their

41

agreement to fund on an as needed basis after the construction drawings were done, bids received, another joint venture partner found, and the bank approved a loan.

128. When the KAI TRUST became aware that HAWAIIAN RIVERBEND was severely undercapitalized and that Mr. Miroyan had been distracted by a different and unrelated civil lawsuit which put him in financial distress, the Trustees of the KAI TRUST took advantage of Mr. Miroyan and HAWAIIAN RIVERBEND's vulnerability to breach their agreements to provide funding.

129. The KAI TRUST breached every aspect of its business arrangements with HAWAIIAN RIVERBEND.

130. The ultimate plan for the Development Project on the Subject Property was to create a shopping center.

131. The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid off through the profits from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

132. HAWAIIAN RIVERBEND was damaged in that it was unable to develop or sell the Subject Property in the manner which was initially planned and contemplated by the parties, creating significant financial losses.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

### NINTH CAUSE OF ACTION
#### Unjust Enrichment
(Against KENNETH Y. KAI and TAE K. KAI individually and as TRUSTEES OF THE KAI FAMILY 1998 TRUST)

133. HAWAIIAN RIVERBEND re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

134. The KAI TRUST received a promissory note for $840,000 plus interest and fees and a mortgage securing that note with the Subject Property while it was a business partner to HAWAIIAN RIVERBEND.

135. HAWAIIAN RIVERBEND conferred a benefit upon The KAI TRUST by giving to it, as a result of deceptive acts, misrepresentations and omissions of material fact, over $840,000 worth of assets that it was not actually entitled to.

136. As a result of the above-described transactions with HAWAIIAN RIVERBEND, The KAI TRUST received a benefit and was enriched, and it would be unjust if it were allowed to retain the full value of the $840,000 promissory note and mortgage.

137. The KAI TRUST has enjoyed and will further and imminently enjoy unjust enrichment and has profited and will further profit at foreclosure sale and deceptively preyed upon the naïve nature of HAWAIIAN RIVERBEND, a single member LLC with

an unsophisticated managing member and sole owner that is
currently in financial distress.

138. HAWAIIAN RIVERBEND conferred a benefit upon The KAI
TRUST by giving to it as a result of deceptive acts and breaches
over $840,000 in equity in the Subject Property that The KAI
TRUST was not actually entitled to.

139. As a result The KAI TRUST received a benefit and was
enriched, and it would be unjust if it were allowed to retain
the full equity amount gained, over $840,000, the amount to be
determined at trial.

**TENTH CAUSE OF ACTION**
**Quiet Title**
**(Defendants Claiming Any Interest In the Subject Property)**
(Against KENNETH Y. KAI and TAE K. KAI as TRUSTEES OF THE KAI
FAMILY 1998 TRUST)

140. HAWAIIAN RIVERBEND re-alleges and incorporates by
reference all preceding paragraphs as though fully set forth
herein.

141. HAWAIIAN RIVERBEND is at all times herein mentioned
the owner and/or entitled to possession of the Subject Property
and a clear title to same.

142. Because KAI TRUST gained its currently recorded
interest in the Subject Property (the above referenced Note and
Mortgage) through illegal means, that interest is void.

143. HAWAIIAN RIVERBEND is entitled to have its right to
unencumbered title to the Property restored.

144. HAWAIIAN RIVERBEND is informed, believes and thereupon alleges that all Defendants who claim an interest in the Subject Property adverse to them is without any right whatsoever, and that the KAI TRUST has no legal or equitable right, claim, or interest in the Property.

145. HAWAIIAN RIVERBEND therefore seeks a declaration that the title to the Subject Property is vested in it alone and that the Defendants herein, and each of them, be declared to have no estate, right, title or interest in the Subject Property and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title or interest in the Subject Property adverse to HAWAIIAN RIVERBEND.

146. Defendants, their officers, servants, employees, attorneys, and all those in active concert or participation with them, should be enjoined from proceeding by process of law or otherwise from attempting to dispossess HAWAIIAN RIVERBEND until their right of ownership is determined by this Court in this case.

147. HAWAIIAN RIVERBEND is entitled to have all mortgages, lis pendens, or other recorded encumbrances on the Subject Property expunged, annulled and voided.

WHEREFORE, HAWAIIAN RIVERBEND prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE HAWAIIAN RIVERBEND, for the causes set forth herein, ask for the following for each Cause of Action sustained:

(a) Immediately take jurisdiction of this matter;

(b) Determine that HAWAIIAN RIVERBEND is the prevailing partie in this action;

(c) That the Court hear, investigate and determine any and all questions of conflicting or controverted titles or claims to the Property, and take such further action as may be authorized under HAW. REV. STAT. Chapter 669:1-8, as amended, and as may be proper and appropriate to quiet title;

(d) For a Declaratory relief awarding Judgment quieting title against Counterclaim/ Third-Party Defendants and their claims to the Property and expunging any documents recorded by Defendants in the State of Hawaii Bureau of Conveyances in relation to the Property filed improperly and without any legal right;

(e) for an amount equal to actual damages for unjust enrichment, breach of contract, and/or breach of promise, unjust enrichment, conversion, unfair competition, of not less than $750,000;

(f)     for an amount equal to all costs of enforcement, including reasonable attorneys' fees, costs, and all out-of-pocket expenses incurred by Counterclaim Plaintiffs in this action;

(g)     for treble damages, statutory and/or punitive damages pursuant to and to the extent allowable by law in an amount to be proven at trial;

(h)     a judgment against Counterclaim Defendants for pre- and post-judgment interest;

(i)     the court's judgment for monetary damages shall be secured by a lien on all Property owned by Counterclaim Defendant; and

(j)     such further and other relief as the Court shall deem just and proper.


DATED:  Hilo, Hawaii this ____ day of March 2016.

_____
PAUL J. SULLA
Attorney for HAWAIIAN RIVERBEND

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI  96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST, | Civil No. 15-1-0164K (Foreclosure) |
| Plaintiff/ Counterclaim Defendant, | **CERTIFICATE OF SERVICE** |
| vs. | |
| HAWAIIAN RIVERBEND, LLC, | |
| Defendant/ Counterclaim Plaintiff, | |
| vs. | |
| COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10, | |
| Defendants, | |
| vs. | |
| KENNETH Y. KAI and TAE K. KAI, as individuals; | |
| Third-Party Defendants. | |

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document(s):

**AMENDED ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY COMPLAINT; CERTIFICATE OF SERVICE**

were duly served upon the following by Faxing and Mailing a copy of same via U.S. Postal Service, postage prepaid at the U.S. Post Office in Hilo, Hawaii on this _____ day of March, 2016, to:

BAYS LUNG ROSE & HOLMA
MICHAEL C. CARROL
MATHEW C. SHANNON
Attorneys at Law
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813

Attorneys for Plaintiff/ Counter-Defendant
KENNETH KAI and TAE KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST

MOLLY A. STEBBINS, ESQ.
Corporation Counsel
BELINDA CASTILLO HALL, ESQ.
Deputy Corporation Counsel
County of Hawaii
101 Aupuni Street, Suite 325
Hilo, Hawaii  96720

Attorneys for Defendant
COUNTY OF HAWAII



Paul J. Sulla, Jr.

49

EXHIBIT 2

[Defendant/ Counterclaim Plaintiff Hawaiian Riverbend, LLC's Memorandum In Opposition To "Plaintiffs' Renewed Motion for Summary Judgment and for Interlocutory Decree Of Foreclosure" ; Declaration of Ryan Smith; Exhibits "A" - "J"; Certificate of Service]

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI 96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST,<br><br>Plaintiff/<br>Counterclaim<br>Defendant,<br><br>vs.<br><br>HAWAIIAN RIVERBEND, LLC,<br><br>Defendant/<br>Counterclaim<br>Plaintiff,<br><br>vs.<br><br>COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10,<br><br>RIVERBEND,<br><br>vs.<br><br>KENNETH Y. KAI and TAE K. KAI, as individuals;<br><br>Third-Party<br>RIVERBEND. | Civil No. 15-1-0164K<br>(Foreclosure)<br><br>**DEFENDANT/ COUNTERCLAIM PLAINTIFF HAWAIIAN RIVERBEND, LLC'S MEMORANDUM IN OPPOSITION TO "PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT AND FOR INTERLOCUTORY DECREE OF FORECLOSURE"; DECLARATION OF RYAN SMITH; EXHIBITS "A" – "J"; CERTIFICATE OF SERVICE**<br><br>**Hearing: April 6, 2016**<br><br>**Time: 4:00 p.m.**<br><br>**Judge: Hon. Ronald Ibarra**<br><br>**No Trial Date Set** |

1

# Table of Contents

I.     INTRODUCTION ............................................... 4

II.    BACKGROUND/FACTS ........................................... 4

III.   STANDARD OF REVIEW ........................................ 13

IV.    ARGUMENT .................................................. 14

   A.    RIVERBEND's Counterclaims are not addressed in Plaintiffs'
   Motion for Summary Judgment and therefore must survive
   Plaintiffs' Motion.......................................... 14

   D.    Plaintiffs have no standing to foreclose. .............. 15

   E.    This Court should follow Bank of N.Y. Mellon v. Lemay, No.
   CAAP-14-0001339 (Haw. App., 2015) and deny summary judgment.  17

*CONCLUSION*................................................... 18

# Table of Authorities

## Cases

*Bank of N.Y. Mellon v. Lemay*, No. CAAP-14-0001339 (Haw. App., 2015) .................................................. 17

*Cervantes v. Countrywide Home Loans, Inc.*, --- F.3d ---- , 2011 WL 3911031, at *7 (9th Cir. Sept. 7, 2011) .................. 16

*Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 482-83, 6 P.3d 349, 354-55 (2000) ......................................... 14

*Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) .................................................. 14

*Kamaka v. Goodsill Anderson Ouinn & Stifel*, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008) ...................................... 14

*Kemp v. Countrywide Home Loans Inc.*, 440 B.R. 624 (Bankr.N.J., 2010) ...................................................... 13

*Landmark National Bank v. Kesler*, 216 P.3d 158 (Kan. 2009).... 17

*Miller v. Manuel*, 9 Haw. App. 56, 66, 828 P.2d 286, 292 (1991) 15

*Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005) ................................................... 14

*Richards v. Midkiff*, 48 Haw. 32, 39, 396 P.2d 49, 54 (1964)... 15

*Veal v. American Home Mortgage Servicing, Inc., et. al.*, BAP Case No. AZ-10-1055 (9th Cir. BAP, June 10, 2011)............ 17

## I. INTRODUCTION

Now comes Defendant/ Counterclaim Plaintiff HAWAIIAN RIVERBEND, LLC (hereinafter "RIVERBEND") by and through its attorney, Paul J. Sulla, Jr. of Hilo, Hawaii, and submits this MEMORANDUM IN OPPOSITION TO "PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT AND FOR INTERLOCUTORY DECREE OF FORECLOSURE" filed by on December 17, 2015 and requests an order denying Plaintiffs' Motion and dismissing the case herein with prejudice. Plaintiffs have:

- not shown that they have standing to foreclose,

- failed to state a claim upon which relief can be granted,

- ignored RIVERBEND's Answer and Counterclaims in its Motion for Summary Judgment,

- left serious questions of fact unanswered which must now be determined by the fact finder at trial because its Declarations in support of its Motion are insufficient.

## II. BACKGROUND/FACTS

This Complaint involves a dispute over the subject real property located at Waikoloa Road and Paniolo Road in Hawaii County at TMK 6-8-002-053 (the "Subject Property"). RIVERBEND was registered as a Hawaii Limited Liability Company on July 14, 2005. It is currently a single member LLC wholly owned and operated by California resident Michael Miroyan ("Mr. Miroyan") who has served as the Managing Member of HAWAIIAN RIVERBEND

since July 14, 2005. Because Mr. Miroyan has had problems attending to RIVERBEND's affairs in Hawaii, new Co-Managing Member, Ryan Smith was recently appointed by RIVERBEND.

On or around May 3, 2010 the KAI TRUST and HAWAIIAN RIVERBEND allegedly executed a Promissory Note for $540,000 with 5% interest rate (hereinafter "First Note"). The First Note included $180,000 of pre-paid interest. The actual cash received by Hawaiian Riverbend LLC was approximately $330,000.00. The First Note was provided for an overstated principal amount and thus it contains hidden interest. This hidden interest, once identified and calculated, is at a rate that far exceeds the 12% allowable rate under Hawaii usury laws. The lender's intent to avoid the civil and criminal penalties for usury is what causes such interest to become hidden.[1]

On or around April 28, 2010 a Real Property Mortgage was allegedly executed between the KAI TRUST and HAWAIIAN RIVERBEND,

---

[1] See **Exhibit "A"**, attached. "§ 6.05 Hidden Interest… [4] Interest Hidden When Principal Amount Is Overstated… Another way of hiding interest is to exaggerate the amount of principal which a borrower has received… At least two usury issues are raised by such transactions… if a lender finances hidden interest fees, this means that the face amount of the note signed by the borrower includes interest charges. Since the lender charges interest on the full face amount of the notice including the hidden interest, it will also be assessing interest on interest or compounding… The presence of compounding raises issues beyond the legality of the effective interest rate charged by the lender… A fairly novel transaction in which interest may be hidden by the exaggeration of the loan principal is the "wraparound" mortgage." Source: LEXSTAT 1-6 DEBTOR-CREDITOR LAW § 6.05, 2009.

encumbering 31.3 acres of TMK #6-8-02-21 (hereinafter the "Original Lot"), owned by HAWAIIAN RIVERBEND, securing the First Note (hereinafter "Original Mortgage"). This document was recorded as Doc. No. 2010-062606 in the Hawaii Bureau of Conveyances.

By virtue of a prior Membership Purchase Agreement between the KAI TRUST and HAWAIIAN RIVERBEND wherein the KAI TRUST purchased a 50% membership interest in HAWAIIAN RIVERBEND, and upon execution of the First Note and Mortgage in 2010, the KAI TRUST became simultaneously members of HAWAIIAN RIVERBEND and the first mortgage holder on 31.3 acres of TMK #6-8-02-21 prior to its subdivision in to three parcels which occurred on February 13, 2013 with Hawaii County Counsel approval. See **Exhibit "B"**, Sulla Decl., attached. The Subject Property is one of these three parcels that this original lot was subdivided into.

Pursuant to the Membership Purchase Agreement signed by the KAI TRUST, HAWAIIAN RIVERBEND made various capital calls upon the KAI TRUST which they were obligated to meet. See **Exhibit "C"**, Smith Decl., attached. The KAI TRUST failed to provide the capital that they promised to provide HAWAIIAN RIVERBEND pursuant to the Membership Purchase Agreement and yet still retained a 50% ownership. HAWAIIAN RIVERBEND granted the KAI TRUST an interest in the Original Lot based on its promise to

fund HAWAIIAN RIVERBEND with the capital needed to develop the lot. The KAI TRUST did not provide the HAWAIIAN RIVERBEND LLC with the capital that it promised it would, which was the consideration for HAWAIIAN RIVERBEND signing the First Note and the Original Mortgage.

On July 13, 2012 a Capital Call by HAWAIIAN RIVERBEND for $12,500 by its Manager, Mike Miroyan, went unfunded. The records of this July 13, 2012 Capital Call shows that HAWAIIAN RIVERBEND's Manager became suspicious of the KAI TRUST's intentions in breaching its agreement and realized that its grant of the First Note and Original Mortgage to the KAI TRUST made in good faith based upon the promise of future capital contributions by them to HAWAIIAN RIVERBEND might be abused. Mr. Miroyan expressed his concerns on the face of the July 13, 2012 Capital Call wherein he states: "As you know you have a note due in May 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share [of] $12,500 into the [HAWAIIAN RIVERBEND Bank of America Account] today." See **Exhibit "C"**, Smith Decl., attached.

A subsequent capital call made by HAWAIIAN RIVERBEND (pursuant to its agreement with the KAI TRUST) on September 11, 2012 also went unfunded. The KAI TRUST received the First Note and Original Mortgage for $540,000 based upon its execution of

the HAWAIIAN RIVERBEND Membership Purchase Agreement wherein it agreed to provide at least $540,000 in cash to fund the LLC so that it could operate. See **Exhibit "B"**, Smith Decl., attached.

Instead of providing the funds that it promised, the KAI TRUST provided only $31,000 to HAWAIIAN RIVERBEND.[2] See **Exhibit "D"**, Smith Decl., attached. This significant undercapitalization of HAWAIIAN RIVERBEND undermined the LLC's effectiveness, hampered proper development of the Original Lot (hereinafter "The Project"), and soured the relationship between the parties.

When HAWAIIAN RIVERBEND confronted the KAI TRUST about its breach of agreement and the debilitating effect their lack of funding was having on The Project, the KAI TRUST and HAWAIIAN RIVERBEND executed an additional agreement on January 11, 2013 wherein the KAI TRUST agreed to provide $69,000 to HAWAIIAN RIVERBEND over a four month period. See **Exhibit "E"**, Smith Decl., attached. However, only $20,000 was actually provided by check dated January 11, 2013.

On June 2, 2013, Mr. Miroyan sent the Trustees of the KAI TRUST an e-mail wherein he documents that the amounts that the KAI TRUST promised to provide to HAWAIIAN RIVERBEND still had not been paid. See **Exhibit "F"**, Smith Decl., attached. Specifically a Capital Call from September 2012 to pay Sydney

---

[2] Check # 4746 dated Dec. 19, 2011 for $25,000; Check #4921 dated March 10, 2012 for $3,000 and Check #5047 dated May 11, 2012 for $3,000.

Fuke, Planning Consultant, and property taxes on the Original Lot, remained unpaid. At the time, on June 2, 2013, the KAI TRUST had not paid HAWAIIAN RIVERBEND any payments for over a year and had been in breach of its Membership Purchase Agreement with the KAI TRUST for over a year. The KAI TRUST also withheld copies of the First Note from HAWAIIAN RIVERBEND, which was indicative of its bad faith intent.

Based on the above promises, inducements, agreements, and representations on the part of the KAI TRUST, HAWAIIAN RIVERBEND executed a First Amendment of Real Property Mortgage on or around March 1, 2013 to update the legal description of the Original Parcel that included the Subject Property. On or around June 2013 the KAI TRUST entered into a new Membership Purchase Agreement for HAWAIIAN RIVERBEND Membership Units wherein it sold all of its Membership Interest in the LLC to Mr. Miroyan in exchange for a new promissory note and mortgage. See **Exhibit "G"**, Smith Decl., attached. This new note referenced in the June 2013 agreement increased the prior note amount by $300,000 to $840,000 and encumbered the Subject Property.

Based on the above agreements, on July 15, 2013 the KAI TRUST executed a "Partial Release of Mortgage" recorded in the Hawaii Bureau of Conveyances on August 8, 2013 wherein most of the encumbrance on the Original Parcel [pre-subdivision TMK No. (3) 6-8-002-021] was released in the form of a release of two of

9

the three parcels created from the subdivision of the original parcel [TMK No. (3) 6-8-02-052, designated to become a County Park; and TMK No. (3) 6-8-02-021 a 5.95 acre Ag5 lot]. The only parcel that did not obtain a mortgage release was the Subject Property, TMK NO. 6-8-02-053 which is 14.6 acres zoned commercially, future site of a planned commercial village with significant economic value.

On or around August, 2013 the KAI TRUST and Mr. Miroyan/ RIVERBEND entered into an agreement entitled "Hawaiian Riverbend LLC Amendment to Operating Agreement" wherein the parties agreed that the $840,000 Note (hereinafter the "New Note") would be paid down from the "net proceed of the sale of parcel 21", which is a 5.95 acre parcel at TMK(1)6-8-002-021. See **Exhibit "H"**, Smith Decl., attached. This parcel is not the Subject Property. This increase in the First Note from $540,000 to $840,000 occurred without the KAI TRUST providing any discernable consideration. No funds were provided from the KAI TRUST, despite a promise by the KAI TRUST to provide additional funds.

The Subject Mortgage and Note were atypical transactions linked to and contingent upon multiple other agreements which can be seen by **Exhibit "I"**, Smith Decl. attached, which is a copy of "The Reconciliation Summary as of 8/3/13" between the parties. This document references the Subject Note and Mortgage herein.

The reason why the KAI TRUST did not have to provide any cash upfront in exchange for the promissory notes is because the amounts were due as the expenses were incurred during the subdivision of the Original Parcel and development of the Subject Property.  For example, there existed an agreement for funding to be provided by the KAI TRUST pursuant to their agreement to fund on an as needed basis after the construction drawings were done, bids received, another joint venture partner found, and the bank approved a loan.

When the KAI TRUST became aware that HAWAIIAN RIVERBEND Manager Mr. Miroyan had been distracted by a different and unrelated civil lawsuit which put him in financial distress, the Trustees of the KAI TRUST took advantage of Mr. Miroyan and HAWAIIAN RIVERBEND's vulnerability to breach their agreements to provide funding.  The KAI TRUST breached every aspect of its business arrangement with HAWAIIAN RIVERBEND.  The KAI TRUST procured the New Note by fraud and deceit.

The KAI TRUST purposefully kept HAWAIIAN RIVERBEND underfunded in breach of their agreement with HAWAIIAN RIVERBEND in order to take advantage of HAWAIIAN RIVERBEND by bringing its foreclosure Complaint herein and knowing that HAWAIIAN RIVERBEND would not have sufficient funding to obtain counsel to defend itself, thereby reaping a windfall based on sums allegedly owed that the KAI TRUST never actually paid.  The KAI TRUST delayed

the partial release of mortgage that it agreed to execute and interfered with the escrow process during the sale of the released parcels intentionally to further weaken HAWAIIAN RIVERBEND financially.

The ultimate plan for the Development Project on the Subject Property was to create a shopping center. See **Exhibit "J"**, Smith Decl., attached. The planned shopping center is in a prime location and the project would have been done by now and all notes fully paid off through the profit from this project had the KAI TRUST not intentionally interfered with the HAWAIIAN RIVERBEND's execution of the project and breached their agreement to provide the necessary cash to fund the project.

The KAI TRUST filed a Complaint for Foreclosure of the Subject Property on May 1, 2015, claiming to be the owner of the Mortgage Note giving it the power of sale to foreclose on the subject property. However, The KAI TRUST is silent as to the other agreements with HAWAIIAN RIVERBEND described above. All agreements relate to each other and they must be litigated in tandem for any justice to be had herein because it represents multiple competing and necessarily related claims between the parties and over the same Property. It is disingenuous for counsel to ignore the fact that there were other agreements that inform the agreement which The KAI TRUST is using as a basis to foreclose.

## III.    STANDARD OF REVIEW

The standard for granting a motion for summary judgment is well settled:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, [the appellate court] must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005) (original brackets and citation omitted). *See also Kamaka v. Goodsill Anderson Ouinn & Stifel*, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008).

On a motion for summary judgment, "[a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 482-83, 6 P.3d 349, 354-55 (2000) (quoting *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982)). "[A] 'genuine issue as to any [material] fact'… under a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result." *Richards v. Midkiff*, 48 Haw. 32, 39, 396 P.2d 49, 54 (1964). Affidavits in support of a summary judgment motion are

scrutinized to determine whether the facts they aver are admissible at trial and are made on the personal knowledge of the affiant. Also, ultimate or conclusory facts or conclusions of law are not to be utilized in a summary judgment affidavit. *Miller v. Manuel*, 9 Haw. App. 56, 66, 828 P.2d 286, 292 (1991) (citations omitted).

## IV. ARGUMENT

### A. RIVERBEND's Counterclaims are not addressed in Plaintiffs' Motion for Summary Judgment and therefore must survive Plaintiffs' Motion.

RIVERBEND filed an Answer with Counterclaims on March 11, 2016. No answer to the Counterclaims has been filed. Because the present Motion pre-dates RIVERBEND's Answer, it fails to include RIVERBEND's Counterclaims. As a result, even if KAI TRUST were to prevail on its Motion it would not conclude this case. RIVERBEND's Counterclaims must still survive this Motion for Summary Judgment untouched. The same goes for RIVERBEND's Third Party Complaint claims, which are still awaiting service.

The Motion for Summary Judgment was filed prior to Plaintiff filing their Answer to RIVERBEND' Counterclaims or any party submitting any discovery requests at all. Serious Complaint deficiencies and questions of fact were presented in RIVERBEND's counterclaims which have not been cured by KAI TRUST, despite KAI TRUST being made aware of them.

## B.  __KAI TRUST has no standing to foreclose__.

In its Complaint, KAI TRUST does not independently allege that it owns or holds the Promissory Note behind the debt that it alleges it is owed.  This omission is <u>fatal</u>.  KAI TRUST's Complaint and Motion for Summary Judgment and Memorandum and Declarations in Support do not include in it a Declaration from any KAI TRUST employee with personal knowledge stating, unequivocally, that the KAI TRUST owns and holds the original Subject Promissory Note.  Instead the Declaration in Support of Summary Judgment from THE KAI TRUST merely alleges that the Note "is kept in the course of regularly conducted business".  This is not a statement of fact but an assumption that business as usual occurred.  Nowhere does it say where the original note resides or that the Kai Trust actually owns and holds it.  The way the Motion and supporting documents read, the assertion is not clear and cannot be used as the basis for granting summary judgment herein.

RIVERBEND's concerns are further piqued upon review of the unappealed findings of the court in *Kemp v. Countrywide Home Loans Inc.*, 440 B.R. 624 (Bankr.N.J., 2010) dated November 16, 2010 wherein Judge Wizmur refused to enforce a Promissory Note, finding that "[the Plaintiff] does not qualify as a holder, because it never came into possession of the note."  The pleadings herein do not clearly state that the Kai Trust

actually came into and continues to have actual possession of the promissory note.

Per *Moore* the court cannot accept KAI TRUST's conclusory allegation that it has the right to foreclose because the right to foreclose does not reasonably follow from KAI TRUST's description of what happened, the exhibits presented, or the facts on the public record regarding the parties. Under Hawaii law, and the laws of the vast majority of states, a Plaintiff must believably allege to hold the promissory note that is secured by Defendant's real property via a mortgage or at least allege to be the agent of the holder of the Promissory Note in order to foreclose. It also must describe the subject loan transaction in full, including related side agreements that affect the Subject Property and Subject Mortgage and Note but it does not.

In *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 2011 WL 3911031, at *7 (9th Cir. 2011), the Ninth Circuit explains this common state law rule that a party must unequivocally allege and show that it holds both the note and the mortgage in order to foreclose. Citing *Landmark National Bank v. Kesler*, 216 P.3d 158 (Kan. 2009), the *Cervantes* court explains how a Plaintiff generally must claim that it holds *both* the mortgage and promissory note in order to demonstrate the right to foreclose. Where the movant claims rights as a secured

creditor under a promissory note secured by a lien against real property, it must provide satisfactory proof of its status as the owner or holder of the note at issue.

Without alleging it is the owner and holder of the debt, a Plaintiff does not have standing to bring a foreclosure Complaint. *See Veal v. American Home Mortgage Servicing, Inc., et. al.,* BAP Case No. AZ-10-1055 (9th Cir. BAP, June 10, 2011), supra.

### C. This Court should follow Bank of N.Y. Mellon v. Lemay, No. CAAP-14-0001339 (Haw. App., 2015) and deny summary judgment.

In *Bank of N.Y. Mellon v. Lemay*, No. CAAP-14-0001339 (Haw. App., 2015) the Court vacated the Circuit Court's grant of summary judgment based on an insufficient declaration provided by Plaintiffs' servicer. As in *Lemay*, KAI TRUST's motion is not accompanied by a sufficient declaration. The *Lemay* court noted that if Defendant were able to propound discovery, "the information requested... may have led to evidence contradicting the assertions made in [the Bank's] declaration". *Id.* at 7. In the present matter RIVERBEND is awaiting service of process on its Third Party Complaint and an Answer to its Counterclaims so that it can narrow the scope of the discovery that it is preparing to propound. Because the Order of Default was not set aside herein until February 10, 2016, even if the Answer and Counterclaims and Discovery were all filed the next day, on

February 11, 2016, it still would not have left enough time for RIVERBEND to propound and receive discovery documents from the KAI TRUST so that it could properly defend itself from summary judgment. As such, Summary Judgment is premature and should not issue per *Lemay* until the discovery process is complete.

### CONCLUSION

For the reasons set forth above, KAI TRUST's Complaint should be dismissed and its Motion for Summary Judgment should be denied with prejudice for lack of standing to sue for foreclosure.

DATED: Hilo, Hawaii this 24 day of March 2016.

_____
PAUL J. SULLA, JR. (SBN 5398)
Attorney for HAWAIIAN RIVERBEND LLC

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI 96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST, | Civil No. 15-1-0164K (Foreclosure) |
|       Plaintiff/<br>      Counterclaim<br>      Defendant, | **DECLARATION OF RYAN SMITH; EXHIBITS "A" – "J"** |
|    vs. | |
| HAWAIIAN RIVERBEND, LLC, | |
|       Defendant/<br>      Counterclaim<br>      Plaintiff, | |
|    vs. | |
| COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10, | |
|       RIVERBEND, | |
|    vs. | |
| KENNETH Y. KAI and TAE K. KAI, as individuals; | |
|       Third-Party<br>      RIVERBEND. | |

## DECLARATION OF RYAN SMITH

I, Ryan Smith declare and state as follows:

1.    I am the current co-managing member of the DEFENDANT/ COUNTERCLAIM PLAINTIFF HAWAIIAN RIVERBEND, LLC ("RIVERBEND") in the above captioned matter.

2.    I make this declaration based on my personal knowledge.

3.    This Complaint involves a dispute over the subject real property located at Waikoloa Road and Paniolo Road in Hawaii County at TMK 6-8-002-053 (the "Subject Property").

4.    RIVERBEND was registered as a Hawaii Limited Liability Company on July 14, 2005.  It is currently a single member LLC wholly owned and operated by California resident Michael Miroyan ("Mr. Miroyan") who has served as the Managing Member of HAWAIIAN RIVERBEND since July 14, 2005.  Because Mr. Miroyan has had problems attending to RIVERBEND's affairs in Hawaii, new Co-Managing Member, Ryan Smith was recently appointed by RIVERBEND.

5.    On or around May 3, 2010 the KAI TRUST and HAWAIIAN RIVERBEND allegedly executed a Promissory Note for $540,000 with 5% interest rate (hereinafter "First Note").  The First Note included $180,000 of pre-paid interest.  The actual cash received by Hawaiian Riverbend LLC was approximately $330,000.00.

6.   On or around April 28, 2010 a Real Property Mortgage
was   allegedly   executed   between   the   KAI   TRUST   and   HAWAIIAN
RIVERBEND, encumbering 31.3 acres of TMK #6-8-02-21 (hereinafter
the "Original Lot"), owned by HAWAIIAN RIVERBEND, securing the
First Note (hereinafter "Original Mortgage").   This document was
recorded   as   Doc.   No.   2010-062606   in   the   Hawaii   Bureau   of
Conveyances.

7.   By   virtue   of   a   prior   Membership   Purchase   Agreement
between   the   KAI   TRUST   and   HAWAIIAN   RIVERBEND   wherein   the   KAI
TRUST purchased a 50% membership interest in HAWAIIAN RIVERBEND.
Attached hereto as **Exhibit "B"** is a true and correct copy of the
Interest   Purchase   Agreement   dated   March   2010,   a   signed   copy   of
which   will   be   produced   upon   completion   of   discovery.     Upon
execution of the First Note and Mortgage in 2010, the KAI TRUST
became   simultaneously   members   of   HAWAIIAN   RIVERBEND   and   the
first mortgage holder on 31.3 acres of TMK #6-8-02-21 prior to
its subdivision in to three parcels which occurred on February
13,   2013   with   Hawaii   County   Counsel   approval.     The   Subject
Property is one of these three parcels that this original lot
was subdivided into.

8.   Pursuant to the Membership Purchase Agreement signed
by the KAI TRUST, HAWAIIAN RIVERBEND made various capital calls
upon the KAI TRUST which they were obligated to meet.   Attached
hereto   as   **Exhibit "C"**   is   a   true   and   correct   copy   of   one   of   a

Capital Call dated July 13, 2012. The KAI TRUST failed to provide the capital that they promised to provide HAWAIIAN RIVERBEND pursuant to the Membership Purchase Agreement and yet still retained a 50% ownership.

9. HAWAIIAN RIVERBEND granted the KAI TRUST an interest in the Original Lot based on its promise to fund HAWAIIAN RIVERBEND with the capital needed to develop the lot. The KAI TRUST did not provide HAWAIIAN RIVERBEND LLC with the capital that it promised it would, which was the consideration for HAWAIIAN RIVERBEND signing the First Note and the Original Mortgage.

10. On July 13, 2012 a Capital Call by HAWAIIAN RIVERBEND for $12,500 by its Manager, Mike Miroyan, went unfunded. The records of this July 13, 2012 Capital Call shows that HAWAIIAN RIVERBEND's Manager became suspicious of the KAI TRUST's intentions in breaching its agreement and realized that its grant of the First Note and Original Mortgage to the KAI TRUST made in good faith based upon the promise of future capital contributions by them to HAWAIIAN RIVERBEND might be abused.

11. Mr. Miroyan expressed his concerns on the face of the July 13, 2012 Capital Call wherein he states: "As you know you have a note due in May 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share [of]

$12,500 into the [HAWAIIAN RIVERBEND Bank of America Account] today."

12.   A subsequent capital call made by HAWAIIAN RIVERBEND (pursuant to its agreement with the KAI TRUST) on September 11, 2012 also went unfunded.

13.   The KAI TRUST received the First Note and Original Mortgage for $540,000 based upon its execution of the HAWAIIAN RIVERBEND Membership Purchase Agreement wherein it agreed to provide at least $540,000 in cash to fund the LLC so that it could operate.

14.   Instead of providing the funds that it promised, the KAI TRUST provided only $31,000 to HAWAIIAN RIVERBEND.[3]   This is evidenced by the checks attached hereto as **Exhibit "D"** which are true and correct copies of the checks written by the KAI TRUST to RIVERBEND.  It is notable that on check no. 5601 dated January 11, 2013 KAI TRUST notes in the memo section that it is the "1st payment agreement", indicating that there were and are other relevant agreements related to this transaction. Significant undercapitalization of HAWAIIAN RIVERBEND undermined the LLC's effectiveness, hampered proper development of the Original Lot (hereinafter "The Project"), and soured the relationship between the parties.

---

[3] Check # 4746 dated Dec. 19, 2011 for $25,000; Check #4921 dated March 10, 2012 for $3,000 and Check #5047 dated May 11, 2012 for $3,000.

15.     When HAWAIIAN RIVERBEND confronted the KAI TRUST about its breach of agreement and the debilitating effect their lack of funding was having on The Project, the KAI TRUST and HAWAIIAN RIVERBEND executed an additional agreement on January 11, 2013 wherein the KAI TRUST agreed to provide $69,000 to HAWAIIAN RIVERBEND over a four month period.  Attached hereto as **Exhibit "E"** is a true and correct copy of this January 11, 2013 Agreement, signed by Tae Kai and Mike Miroyan.  However, only $20,000 was actually provided by check dated January 11, 2013.

16.     On June 2, 2013, Mr. Miroyan sent the Trustees of the KAI TRUST an e-mail wherein he documents that the amounts that the KAI TRUST promised to provide to HAWAIIAN RIVERBEND still had not been paid.  Attached hereto as **Exhibit "F"** is a true and correct copy of an e-mail from Mike Miroyan to Tae Kai evidencing this Capital Call.  Specifically a Capital Call from to pay Sydney Fuke, Planning Consultant, and property taxes on the Original Lot, remained unpaid.  At the time, on June 2, 2013, the KAI TRUST had not paid HAWAIIAN RIVERBEND any payments for over a year and had been in breach of its Membership Purchase Agreement with the KAI TRUST for over a year.

17.     The KAI TRUST also withheld copies of the First Note from HAWAIIAN RIVERBEND, which was indicative of its bad faith intent.

18.  Based on the above promises, inducements, agreements, and representations on the part of the KAI TRUST, HAWAIIAN RIVERBEND executed a First Amendment of Real Property Mortgage on or around March 1, 2013 to update the legal description of the Original Parcel to include the description of the Subject Property.

19.  On or around June 2013 the KAI TRUST entered into a new Membership Purchase Agreement for HAWAIIAN RIVERBEND Membership Units wherein it allegedly sold all of its Membership Interest in the LLC to Mr. Miroyan in exchange for a new promissory note and mortgage.  Attached hereto as **Exhibit "G"** is a true and correct copy of this Membership Purchase Agreement, a signed copy to be produced once discovery responses are received.  This new note referenced in the June 2013 membership agreement increased the prior note amount by $300,000 to $840,000 and encumbered the Subject Property.

20.  Based on the above agreements, on July 15, 2013 the KAI TRUST executed a "Partial Release of Mortgage" recorded in the Hawaii Bureau of Conveyances on August 8, 2013 wherein most of the encumbrance on the Original Parcel [pre-subdivision TMK No. (3) 6-8-002-021] was released in the form of a release of two of the three parcels created from the subdivision of the original parcel [TMK No. (3) 6-8-02-052, designated to become a County Park; and TMK No. (3) 6-8-02-021 a 5.95 acre Ag5 lot].

The only parcel that did not obtain a mortgage release was the Subject Property, TMK NO. 6-8-02-053 which is 14.6 acres zoned commercially, future site of a planned commercial village with significant economic value.

21. On or around August, 2013 the KAI TRUST and Mr. Miroyan/ RIVERBEND entered into an agreement entitled "Hawaiian Riverbend LLC Amendment to Operating Agreement" wherein the parties agreed that the $840,000 Note (hereinafter the "New Note") would be paid down from the "net proceed of the sale of parcel 21", which is a 5.95 acre parcel at TMK(1)6-8-002-021. Attached hereto as **Exhibit "H"** is a true and correct copy of this Amendment to Operating Agreement, a signed copy to be produced once discovery responses are received. This increase in the First Note from $540,000 to $840,000 occurred without the KAI TRUST providing any consideration. No funds were provided from the KAI TRUST, despite a promise by the KAI TRUST to provide additional funds.

22. The Subject Mortgage and Note were atypical transactions linked to and contingent upon multiple other agreements which can be seen by **Exhibit "I"**, attached, which is a true and correct copy of "The Reconciliation Summary as of 8/3/13". This document references the Subject Note and Mortgage herein.

23.   The ultimate plan for the Development Project on the
Subject Property was to create a shopping center.   This vision
and its associated project complexity and multiple
interconnected deals is described in the April 26, 2015 e-mail
from Michael Miroyan to Tae Kai, a true and correct copy of
which is attached hereto as **Exhibit "J"**.   The planned shopping
center is in a prime location and the project would have been
done by now and all notes fully paid off through the profits
from this project had the KAI TRUST not intentionally interfered
with the HAWAIIAN RIVERBEND's execution of the project and
breached their agreement to provide the necessary cash to fund
the project.

I declare under penalty of perjury that the foregoing is
true and correct.

Dated:  Hilo, Hawaii, March  24 , 2016


_____
Ryan Smith

27

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
Hilo, HI  96720
Telephone: 808/933-3600

Attorney for Defendant
HAWAIIAN RIVERBEND, LLC

**IN THE CIRCUIT COURT OF THE THIRD CIRCUIT**

**STATE OF HAWAII**

| | |
|---|---|
| KENNETH Y. KAI and TAE K. KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST,<br><br>       Plaintiff/<br>       Counterclaim<br>       Defendant,<br><br>   vs.<br><br><br>HAWAIIAN RIVERBEND, LLC,<br><br>       Defendant/<br>       Counterclaim<br>       Plaintiff,<br><br>   vs.<br><br>COUNTY OF HAWAII; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL ENTITIES 1-10,<br><br>       RIVERBEND,<br><br>   vs.<br><br>KENNETH Y. KAI and TAE K. KAI, as individuals;<br><br>       Third-Party<br>       RIVERBEND. | Civil No. 15-1-0164K<br>(Foreclosure)<br><br><br>**CERTIFICATE OF SERVICE**<br><br><br>**No Trial Date Set** |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s):

**DEFENDANT/ COUNTERCLAIM PLAINTIFF HAWAIIAN RIVERBEND, LLC'S MEMORANDUM IN OPPOSITION TO "PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT AND FOR INTERLOCUTORY DECREE OF FORECLOSURE"; DECLARATION OF RYAN SMITH; EXHIBITS "A" – "J"; CERTIFICATE OF SERVICE**

were duly served upon the following by mailing a copy of same via U.S. Postal Service, postage prepaid at the U.S. Post Office in Hilo, Hawaii on this _____ day of March, 2016, to:

BAYS LUNG ROSE & HOLMA
MICHAEL C. CARROL
MATHEW C. SHANNON
Attorneys at Law
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813

Attorneys for Plaintiff/ Counter-Defendant
KENNETH KAI and TAE KAI, TRUSTEES OF THE KAI FAMILY 1998 TRUST

MOLLY A. STEBBINS, ESQ.
Corporation Counsel
BELINDA CASTILLO HALL, ESQ.
Deputy Corporation Counsel
County of Hawaii
101 Aupuni Street, Suite 325
Hilo, Hawaii 96720

Attorneys for Defendant
COUNTY OF HAWAII

Dated: Hilo, Hawaii this 24th day of March, 2016.

_____
LOCKEY WHITE



LEXSTAT 1-6 DEBTOR-CREDITOR LAW § 6.05

Debtor-Creditor Law

Copyright 2009, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

PART I Consumer Credit
CHAPTER 6 The Cost of Credit

*1-6 Debtor-Creditor Law § 6.05*

## § 6.05 Hidden Interest

### [1] Overview

For as long as usury restrictions have existed, creditors have attempted to circumvent their limitations. These tactics are addressed in this section under the title of "hidden interest." For the purposes of this section, "hidden interest" refers to charges or other consideration paid in conjunction with a credit contract, which are classified as interest under state law regulating the transaction but which are not described as such, or are not described at all, in the contract, and which are consequently not included in the stated interest rate.

To use a simple example, if a lender charges the maximum interest rate on the face of a loan contract and, in addition, imposes a $100 "loan fee," that fee may constitute usurious hidden interest unless it is specifically allowed as a non-interest charge under state law.

### [2] Payments for Lender Services: What Is Interest?

### [a] Fees Based on the Creditor's Expenses

"Interest" can be defined as compensation paid to a lender for the use of money or the forbearance of a debt.n1 Broadly applied, such a definition would include any payment to a lender, regardless of whether the lender used the payment to cover expenses or instead attributed it to profit. However, in an attempt to circumvent the interest ceilings set by statute or agreement and to disguise the actual costs of a loan to the borrower, creditors have traditionally argued that certain specific expenses associated with a loan, such as closing costs or credit insurance, especially those costs attributable to third party services,n2 are not compensation for the loan and therefore not "interest."

This approach is widely accepted under state law even when the separate services primarily benefit the lender.n3 As a general rule, recognized lender fees may be excluded from interest if they compensate the lender for reasonable expenses actually incurred in connection with a particular loan.n4 Following the same approach, any charge which cannot be attributed to a specific loan-related expense is designed merely to cover the lender's overhead expenses or to contribute to its profit, and is interest on the loan unless a statute specifically says otherwise.n5

Exhibit "A"

In the automobile financing context, dealers have begun to separately impose charges for specific "services." Fees commonly added to the cost of a car include delivery and handling fees, and conveyance charges (imposed to register title to the vehicle with the state motor vehicle department). These fees may constitute interest when the dealer is the lender for a variety of reasons. The dealer may not perform the service, may inflate the actual cost, or may be reimbursed by a third party, such as the manufacturer, for the cost. Further, the state retail sales installment act may limit the types of fees which the lender may impose. Fees not specifically allowed should constitute interest and support an usury claim. Such fees may also be challenged under state UDAP actsn6 and the Truth in Lending Act.n7

Because the types and amounts of fees which may be excluded from interest vary widely from state to state and may, within any state, vary with the class of lender and loan, the first step to determine whether a lender has properly excluded specific fees from interest on a contract must be to check the relevant state code.

Loan document preparation fees present an interesting issue that other fees do not. In addition to the potential claim that these fees may not be authorized by state law and that they may be interest, advocates should explore whether the entity preparing the documents was engaged in the unauthorized practice of law. If the lender or other entity charged a fee for preparing or filling in the blanks on legal documents and this activity was incidental to the entity's business, the lender or entity may be engaged in the unauthorized practice of law. For example, in *Lawson v. First Union Mortgage Co.*, the Indiana Court of Appeals reversed the trial court's dismissal of a equitable claim for return of a document preparation fee, holding that while a lender's lay employees did not commit the unauthorized practice of law by preparing mortgage loan documents, the lender could not charge a separate fee for such documents.n8

### [b] Points, Commitment Fees, and Other Percentage Fees

One type of ostensibly non-interest charge which has been increasingly used and misused by lenders in recent years is a fee calculated as a percentage of loan principal. Depending on the type of lender and loan involved, this fee may be variously described as an "origination fee," "commitment fee," "service charge," or "loan fee," but is perhaps best known as "points" or "discount points," with one point being a sum equal to one percent of the loan principal.n9

Points are essentially a "bonus": An additional incentive or inducement supposedly offered to the lender to convince it to issue a loan. As such, it is logically very difficult to characterize points as anything but interest.n10

When statutes do not address the issue, lenders carry the burden of demonstrating that points and other fees are justified by actual recognized costs associated with a loan, and are not merely extra profit or compensation for overhead expense.n11 In the case of points, it is a burden that lenders can seldom carry, and numerous courts have found points and similar fees to constitute hidden interest.n12

More commonly, the relevant state statute specifically permits the exclusion of points, often allowing one or two points to be excluded from interest.n13 Sometimes this exclusion is granted in lieu of permitting other charges to be passed on to borrowers.n14 In any event, the existence of such statutes is helpful to consumers in at least one way: by specifying how many points and other fees may be excluded from interest, these statutes clearly imply that any additional fees are to be treated as interest.n15

When statutes do not control this issue, a few courts have recognized the exclusion of a percentage fee from interest in one other situation: the commitment fee. Commitment fees are found mainly in commercial loans and are assessed when a lender agrees to hold open a line of credit for a certain time, at a given interest rate. Some courts have viewed commitment fees as proper non-interest compensation due to the lender for granting the borrower an ongoing option to borrow money,n16 although there is authority for the position that the

fee must be reasonable to be excluded from "interest."n17 Other courts have held that commitment fees merely compensate the lender for normal overhead risk involved in lending and are, therefore, interest.n18

A variation on commitment fees is the "rate lock fee," which consumers pay to obtain a certain interest rate for a mortgage. However, this fee is different in that it does not guarantee the option to borrow, but instead guarantees the price of borrowing if the loan is approved.

### [c] Non-Cash Compensation and Side Agreements

Payments to a creditor under a contract may take forms other than the stated interest or the various cash fees, such as points and service charges. Non-cash bonuses may also be exacted by lenders in consideration for the extension of credit, and may constitute hidden interest in the same manner as cash payments.n19 For example, the borrower's agreement to guarantee or cosign a third party debt owed to the lender may be interest on the contract,n20 as may a sharing of rents from mortgaged property.n21

A major impediment to the claim that non-cash bonuses are hidden interest may be encountered if the benefit to the lender is contingentn22 or if the value of the bonus for some other reason cannot be quantified. This problem arises most frequently when a loan contract grants the lender a share of the profits from the borrower's business or investment in consideration for making the loan.

### [d] Delinquency Charges

Late fees, like any other payments made to a lender, are a potential source of hidden interest and should be closely scrutinized.n23 A lender's ability to exclude late charges from interest on a contract varies widely from state to state, and reference to the relevant state's statutes and case law is essential to the analysis of any particular case. This section will examine the various general approaches taken by courts considering whether late fees should be classified as interest.n24

The general rule is that late fees are excluded from interest because the fees are avoidable or, more precisely, are contingent on the performance of the borrower.n25 The logic of this common law approach is questionable in many consumer credit cases because the late payment is often not so much a matter of the borrower's voluntary decision as one of economic necessity.n26

A second justification for the imposition of late fees is that such fees compensate creditors for expenses incurred when payments are made late, such as dunning costsn27 and loss of use of the principal which was due.

Statutes which govern late fees are generally more advantageous for consumers than this general common law rule. First, the limits of the permissible fees are often specified, and late fees will clearly be interest to the extent that they exceed the statutory limit.n28

Second, fees assessed prior to the expiration of statutory grace periods constitute interest.n29 Third, statutes governing late payment fees may contain other requirements in addition to capping the amount of the fee. Failure to meet those requirements may also give rise to a usury claim. A late fee may also be challengeable under contract or other theories. Finally, not all statutes which regulate lender fees permit any exclusion of late fees from interest. Courts in several states have determined that late fees fall within statutory definitions of interest in the absence of an express statutory exception.n30

This analysis may be clouded by recent developments regarding interstate banking and deregulation and rate exportation. To help the banks, the legislatures in states wanting to attract this industry have declared non-interest charges, including late fees, to be interest.n31 The cases considering late fees as interest in this

context of interstate rate exportation and preemption have found them to be so,n32 as have bank regulatory agencies.n33

These cases have arisen in context of the laws of a deregulated state (the lender's home state) preempting the consumer protection laws of a regulated state (the borrower's home state), so it is the consumers who have lost by classifying late fees as interest in these cases.n34

### [3] Payments for Third Party Services

Third party payments may cover a myriad of services: brokers' fees, appraisal fees, recording fees, credit insurance, inspection fees, and attorneys' fees, to name but a few. Case law and statutes generally exclude reasonable, bona fide third party payments from interest on credit contracts.n35 Despite this general rule, hidden interest issues arise in several important situations.

One example of a third party payment which has frequently been revealed to be usurious hidden interest is the commission charged by a loan broker. Fees to bona fide third party brokers are valid third party expenses in most jurisdictionsn36 and are expressly regulated in some states.n37 However, numerous courts have held that brokers' fees are interest on a loan when the broker is an agent of the lender and, hence, is not a bona fide third party.n38

Attorneys whose clients have been assessed brokers' fees should closely examine the transaction. As with other third party payments, fees which are collected when no third party exists, which are never forwarded to a third party, or which are kicked back to the lender, are interest.n39 Furthermore, illegal broker's fees exacted with the knowledge of the lender have been treated as interest.n40 When broker fees have been paid to apparently independent brokers, attorneys should examine the relationship between the broker and lender for a possible agency relationship.n41

Advocates should also note that the Real Estate Settlement Procedure Act ("RESPA"), now applicable to most home equity loans, has an anti-kickback provision which may be implicated in some broker-lender arrangements.n42

Another common third party payment is for attorneys' services. If the recovery is authorized by contract, most states allow creditors to obtain a judgment for the attorneys' fees that they incurred in collecting a debt from a defaulting debtor.n43 There are limits on the recovery but there seems to be general agreement that contractual provisions for the payment of attorneys' fee in the event of default are exempt from usury restrictions unless they are somehow used as a "cloak" for usury.n44

Charges for the services of an attorney in preparing loan papers or searching real estate title are quite different from charges associated with debt collection. Some courts have ruled that a creditor's charge for legal fees incurred in loan preparation are merely overhead expense and, as such, are interest subject to usury law.n45 Other courts have been more lenient with creditors and have ruled that such attorneys' fees, if paid to a bona fide third party attorney,n46 are valid third party expenses which may be charged to the borrower without being treated as interest.n47 As with other types of closing costs, applicable statutes may dictate the appropriate treatment of attorneys' fees for this type of service.n48

### [4] Interest Hidden When Principal Amount Is Overstated

Another way of hiding interest is to exaggerate the amount of principal which a borrower has received. Undoubtedly the most common technique used to inflate loan principal is the inclusion of various fees in the face amount of the note signed by the borrower.

At least two usury issues are raised by such transactions. First, as discussed above, a consumer's attorney must question whether the fees assessed by the creditor fall within the definition of interest under state law.

In addition, if a lender finances hidden interest fees, this means that the face amount of the note signed by the borrower includes interest charges. Since the lender charges interest on the full face amount of the notice including the hidden interest, it will also be assessing interest on interest or compounding.

The presence of compounding raises issues beyond the legality of the effective interest rate charged by the lender. Courts traditionally frown upon the use of compound interest, and merely the presence of compounding may be treated as a contract overcharge in some jurisdictions, even when the usury ceiling has not been breached.n49

Also, if the insurance is required as part of the credit transaction, the fee may be illegal under state law for this reason.n50

A fairly novel transaction in which interest may be hidden by the exaggeration of the loan principal is the "wraparound" mortgage. A wraparound mortgage is defined as a junior mortgage which secures a promissory note, the face amount of which is equal to the sum of: (1) the principal balance remaining on the existing senior mortgage; and (2) any additional money advanced by the wraparound lender.n51 Wraparound mortgages may be structured either as purchase money mortgages or as mortgages executed for refinancing purposes.n52 Litigation testing the validity of wraparound mortgages under state usury laws is quite sparse.n53

In general, the validity of wraparound mortgages will probably be determined by the definitions of principal and interest in individual usury statutes.n54 Wraparounds have been expressly validated in some state codes,n55 but may be prohibited by the provisions of some second mortgage statutes. The terms of the individual statutes should be carefully examined to determine whether the lender may include any sum not actually advanced to the borrower in the principal of the note.

Interest can also be hidden in the price of goods purchased on credit. At least, in theory, the concealment of interest in an inflated cash price should cause a usury violation as well, if the true interest rate exceeds the statutory limit. However, several obstacles to an assertion of usury exist, including the traditional "time price" exception to the state usury laws, which means that a state has no usury ceiling for bona fide sales of goods and a seller can charge whatever time price it can extract, short of unconscionability.

A special method by which interest costs may be hidden in the sale price of goods or real estate is the use of "seller's points," which occur most frequently in real estate transactions when the real estate seller, typically a builder, pays points to a bank or other lender in return for the lender's commitment to issue "low-interest" loans to qualified buyers. Such an arrangement might appear to be a boon to buyers and, indeed, seller's points would not be deceptive or usurious if the seller did not recover its expense by raising the selling price of the real estate. In real life, however, seller's points are frequently, if not invariably, just a sales gimmick whose cost is passed on to the buyer in the form of an inflated sale price.n56

The main problem is that under the current version of Regulation Z, discounts for payments by cash instead of credit must be disclosed as finance charges for TILA purposes,n57 while seller's points need not be, even if the points are passed on to the buyer.n58

The open conflict between the seller's points loophole and the requirement that discounts for cash payment be disclosed as a finance charge has yet to be litigated. In light of this uncertainty, the validity of seller's points under state usury laws becomes a particularly important issue.n59

**[5] Hidden Interest in "Non-Credit" Transactions**

Perhaps the ultimate way to hide interest in a credit contract is to conceal the very fact that credit is being extended. This section presents a non-exhaustive discussion of common "non-credit" hidden interest transactions.

One of the egregious forms of hidden interest occurs when a debtor, seeking to obtain or refinance a mortgage, ends up selling his or her home instead. The courts have recognized that such "sales" with repurchase options may, in fact, be usurious loans and that the deeds at issue should be construed to be equitable mortgages.n60 A sale/repurchase or sale/leaseback transaction involving personal property instead of real estate also may be a loan structured to evade usury laws.n61 If the sale/leaseback transaction contains a terminable at will clause, the deal may be covered by the state rent-to-own law which could raise claims and defenses if the lender did not comply with it.

Even if the transaction is a true sales/leaseback, state law may provide special protections.n62

A new phenomenon has surfaced in a growing number of states--the "car pawn." These transactions are really small loans which have been seen with effective (and, often undisclosed) APRs of as much as 900%. A good description of the scheme is contained in *Pendleton v. American Title Brokers, Inc.*,n63 the first case to consider it. In brief, the borrower pledged his or her car in exchange for a small loan, and at the same time, executed a leaseback for the pledged car, making weekly payments on both the loan and the lease. With credit insurance, and an undisclosed processing fee, the weekly payments resulted in an APR of 977%. The court found that Alabama's consumer credit code applied and that the transaction was subject to the Truth in Lending Act.n64

In the wake of adverse judicial rulings, the industry in some states sought a legislative stamp of approval for title pawns.n65 A few states have sought to limit auto title "pawns" by explicitly requiring that the "pawnbroker" take possession of the vehicle or by excluding pawns made solely against the title of a vehicle.n66 Some municipalities have responded to the growth of the auto title lending industry by enacting their own more protective regulation or through zoning actions.n67

In 2000, the Office of the Comptroller of the Currency issued a warning to national banks about safety and soundness and other risks associated with this type of lending as banks decide whether to partner with local entities to fund these loans.n68 The Letter advises banks to tread carefully given the potential for claims based on the fact that such loans may be based upon the value of the collateral and not on the consumer's ability to repay; lenders fail to rebate the net proceeds to the borrower upon the sale of the car; and some lenders fail to treat these transactions as loans, thus running afoul of the Truth in Lending Act.

A more common method of restructuring a credit transaction is to transform it into a lease. This is a common commercial practice, and a vast body of case law considers whether business transactions are secured credit sales or true leases.n69

In a consumer context, retailers have few reasons to structure credit sales as leases except to attempt to avoid the disclosures, interest ceilings, and repossession limitations imposed by the Federal Truth in Lending Act, state retail installment sales acts, and the Uniform Commercial Code, respectively.n70 Therefore, advocates who are examining purported leases under which ownership may ultimately be transferred to the consumer should be particularly suspicious of the possibility that violations of these statutes may exist.

Perhaps the most important example of the use of leases to conceal consumer credit sales is the "Rent-to-Own" (RTO) leasing industry.

# HAWAIIAN RIVERBEND, LLC MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement, hereinafter referred to as the "Agreement", is effective as of March__, 2010, by and between **TAE KAI and KENNETH KAI, as Trustees of the Kai Family Trust,** (hereinafter referred to as the **"Purchaser"**), and **MICHAEL MIROYAN,** (hereinafter referred to as the **"Seller"**) at Los Gatos, California. As hereinafter set forth, **HAWAIIAN RIVERBEND, LLC,** (hereinafter referred to as **"Company"**) is an interested party as to portions of this Agreement, and to the extent applicable, also is a party hereto.

## Recitals

**WHEREAS, Seller** has represented to **Purchaser** that he is the sole owner of all Limited Liability Company interests representing One Hundred (100%) percent of the issued and outstanding membership interests of **Company**; and

**WHEREAS,** Seller desires to sell one half of all of his membership units of the membership interests he owns to **Purchaser,** representing Fifty (50%) percent of the outstanding and issued membership interests, and **Purchaser** desires to purchase such interest from **Seller** on the terms and conditions hereinafter set forth:

**NOW, THEREFORE,** the parties hereto agree as follows:

1.     *Purchase and Sale of Membership Interests.*

1.1. *Purchase.*          Subject to the terms and conditions of this Agreement, **Seller** hereby agrees to sell, transfer, assign, and deliver to **Purchaser** fifty units of his membership interests in Company  (the "Interests"), consisting of Fifty (50%) percent of the issued and outstanding

1

Exhibit "B"

Interests, and **Purchaser** agrees to purchase from **Seller** the Interests, all in accordance with the following plan. **Purchaser** and **Seller** will hereafter own the Company, 50/50.

        1.2.   *Consideration on Purchase.*   The purchase price for the Membership Interest shall be paid as follows:

        A.  *Mortgage Agreement* . The Purchaser shall provide Company with financial funding for its development plans, to be secured by a first mortgage against Company's real property in the principal sum of $527,000, which total amount is made up of the following components: 1). $300,000 to Waikoloa Mauka, LLC; 2). $25,000 for release of lien on previous loan from Purchaser to Company; 3). $50,000 distributed to Seller; 4). $80,000 in escrow representing Company's share of new zoning entitlement costs; 5). $10,000 for real property taxes and assessments and $2,000 for interest on those taxes at 10% per annum; 6).$60,000 for 30 months prepaid interest to Purchaser.

        When the rezoning of Company's real property has been approved, which is projected to occur between April, 2011 and June, 2011, Purchaser will loan Company an additional $40,000 for improvement costs, and will be entitled to an additional $10,000 in interest on the Mortgage, which will then be rewritten to increase the principal amount from $527,000 to $577,000 in favor of Purchaser.

        B.  *Contribution to Seller's Obligations.* Purchaser will provide an additional $25,000 at the time that the Mortgage on Company's property is funded, and Purchaser will provide an additional $20,000 at the time that the rezoning of the Company's property has been approved, to assist Seller in paying Seller's financial obligations to David Dorenfeld and Stefan Martirosian. All remaining obligations of Seller to David Dorenfeld and Stefan Martirosian, will be paid by Seller from his share of any future distributions made from Company.

C. *Cancellation of Indebtedness*. Any and all existing indebtedness of Seller to Purchaser in the form of personal loans, interest obligations, debts for reimbursement arrangements, obligations for all past joint venture, partnership, or other real estate development plans, including, but not limited to the Miroyan Ranch (269 acres in Patterson, California), Sperry Road Business Center, LLC, Patterson Village, LLC, and any other venture will be forgiven and cancelled in conjunction with this sale of Seller's membership interests in Company. The sole exception to this cancellation of any and all indebtedness of Seller is with regard to the $112,500 repayment obligation of Seller on account of the bond posted by Purchaser for Seller's benefit. Seller shall endeavor to pay back this $112,500 sum from other future sources as the opportunity allows.

2. *Closing.*

2.1. *Closing Date.* The closing of the purchase and sale of the Interests (the "Closing") shall be held at such time as the $527,000 new mortgage on the Company's property in favor of Purchaser is recorded. The date of the Closing is hereinafter referred to as the "Closing Date", and shall be endeavored to be met by April__, 2010.

2.2. *Obligations at Closing.* On the Closing Date, or on such other date as consummation of the purchase and sale of Interest described in this may be delayed by verbal agreement of the parties, at the closing place specified in this Agreement:

(a) **Purchaser** shall deliver to **Seller** the remaining consideration to be paid for the Membership Interests being acquired herein; and

(b) **Purchaser** shall acknowledge to **Seller Purchaser**'s cancellation of Seller's other obligations and debts to Purchaser, with the exception of the $112,500 bond debt.

(c) The parties shall execute an Amended Operating Agreement for the Company in the form attached hereto.

3.    _Representations and Warranties of Seller._  **Seller** hereby represents and warrants to **Purchaser** with respect to the transfer of the Interests pursuant to this Agreement as follows:

3.1. _Ownership of the Membership Interests._  Seller is the record owner of the Interests, which Interests were  properly issued under the Hawaii Revised Statutes Section 428.  The interests sold hereunder are not subject to any liens and encumbrances, and are subject to no restrictions with respect to transferability by Seller except for compliance with the terms and provisions of the Company's Operating Agreement.

3.2.    _Authority._    **Seller** represents and warrants  that all actions by **Seller** necessary for the sale of the Interests pursuant hereunder have been taken or will be taken prior to the Closing. **Seller** further represents that this Agreement is a valid and binding obligation of **Seller,** that **Seller** has and, at the closing Date, will have, all requisite legal power to enter into this Agreement, to carry out and perform **Seller's** obligations under the terms of this Agreement and to transfer the Interests to **Purchaser**.

4.    **Additional Terms.**

4.1.    _Entire Agreement; Amendment._    This Agreement constitutes the full and entire understanding and agreement between the parties with respect to the subject hereof.  Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated verbally, but only by a written instrument signed by the party against whom enforcement of any such amendment, waiver, discharge or termination is sought.  In the event of any conflict between the terms of this Membership Interest Purchase Agreement and the Company's Operating Agreement, this Agreement shall be given priority and its terms and conditions shall be enforced to the extent necessary, notwithstanding the terms of the Operating Agreement.

4

4.2. _Notices._   All notices permitted or required under this Agreement shall be, in writing, and shall be deemed delivered when delivered in person, or if mailed, when deposited in a mail box, first class, registered or certified mail, postage prepaid, to **Purchaser** at P.O. Box 3136, San Jose, CA 95156, or to **Seller** at P.O. Box 3181, Saratoga, CA 95070, or such other address which a party may provide by notice in conformity herewith.

4.3.   _Waiver._      The waiver of one breach or default or any delay in exercising any rights shall not constitute a waiver of any subsequent breach or default.

4.4.   _Attorney's Fees._      If either party brings any suit, action, counterclaim, or arbitration to enforce or interpret the provisions of this Agreement, the prevailing party therein shall be entitled to recover a reasonable allowance for attorneys' fees and litigation expenses in addition to Court costs. "Prevailing party" within the meaning of this Section includes without limitation a party who agrees to dismiss an action or proceeding upon the other's payment of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief it seeks.

4.5.   _Governing Law._      The rights and obligations of the parties shall be governed by, and this Agreement shall be construed and enforced in accordance with, the laws of the State of California.

4.6.   _Additional Actions and Documents._   The parties shall execute and deliver such further documents and instruments and shall take such other and further actions as may be required or appropriate to carry out the intent and purpose of this Agreement.

4.7. _Binding on Successors and Assigns._   This Agreement shall be binding on the parties hereto, their respective heirs, executors, administrators, successors and assigns.

4.8 _Counterparts._ This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same document.

In all respects a faxed document which evidences the signature of a party hereto shall be as effective as the original document which manifests the actual signature of the party.

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date set forth above.

**DATED:**

**SELLER**

_____

**MICHAEL MIROYAN**

**PURCHASER**

**DATED:**

_____

**TAE KAI**

_____

**KENNETH KAI**

**COMPANY**

**HAWAIIAN RIVERBEND, LLC**

**BY:**_____
   **MICHAEL MIROYAN, Manager**

**Upon completion of this sale, the Company's ownership will be divided equally between the parties, with a 50% share held by Michael Miroyan, and and 50% share held by Tae Kai and Kenneth Kai as Trustees of the Kai Family Trust.**

| Destination | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| 14089234352 | 07-13 07:51 | 00:00:56 | 000/001 | No Ans | |

Note   TMR: Timer TX, POL: Polling, ORG: Original Size Setting, FME: Frame Erase TX,
MTX: Mixed Original TX, CALL: Manual TX, CSRC: CSRC, FWD: Forward, PC: PC-Fax,
BND: Double-Sided Binding Direction, SP: Special Original, FCODE: F-code, RTX: Re-TX,
RLY: Relay, MBX: Confidential, BUL: Bulletin, SIP: SIP Fax, IPADR: IP Address Fax,
I-FAX: Internet Fax

Result   OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full,
LOVR:Receiving length Over, POVER:Receiving page Over, FIL:File Error,
DC:Decode Error, MDN:MDN Response Error, DSN:DSN Response Error.

CAPITAL CALL
HAWAIIAN Riverbend, LLC
7/13/12   Sent VIA   Mike Miwyas, Managing Member
FAX 923-4352

TO: Dr. Ken ⅋ Tae Kai,

6 DAYS Ago and again in a face to face meeting at your Mt. Hamilton residence on Monday July 9, 2012 I have requested from you and gone over with you the reasons for the CAPITAL CALL:
they are: 1) Property Taxes    $4700 approx
2) Payment to Sidney Fuke $6000
3) Management of LLC    $1200
4) Political Contributions   $13,000
for 4 county seats + mayor's race
the total is $25,000 .... Your 50% is $12,500.xx.
As you know you have a note due  in MAY 2013 and it has occurred to me you are stalling in hope of claiming all the property which would be unfair, unwise and fraudulent. Please remit your share $12,500 into the HR B of A acct. today.
Sincerely,
M. Miwyas

Exhibit "C"

T.K. PROPERTIES
TAE K. KAI
PO BOX 3136
SAN JOSE, CA  95156

5601

11-35/1210 CA
9411

Nov 11, 2013   Date

Pay to the
Order of  HAWAIIAN RIVERBEND, LLC      $ 20,000.00

Twenty Thousand exactly                                    Dollars

**Bank of America**

ACH R/T 121000358

For  1ST payment agreement

⑈121000358⑈ 000679446147⑈ 5601

Exhibit "D"

T.K. PROPERTIES
TAE K. KAI
PO BOX 3136
SAN JOSE, CA 95156

4745

11-35/1210
679

Dec. 19, 2011
Date

Pay to the
Order of   HAWIIAN RIVERBEND   LLC          $ 25,000.⁰⁰

Twenty five thousand exactly _____ Dollars

**Bank of America**
McKee-Toyon
3491 McKee Rd
San Jose CA
408.983.0588

Customer Since
19

For  0142775106

⑆121000358⑆4745⑈06794

---

**Checking Deposit**

LIST CHECKS
BY BANK NO.

DOLLARS

25,000

25,000

Confidential

TOTAL
DEPOSIT

Bank of America, N.A. · Member FDIC

ACCOUNT NUMBER
0142-775106

NAME  HAWAIIAN Riverbend LLC
ADDRESS  San Jose N. Santa Cruz Ave
CITY  CA  95030
ZIP CODE

DATE  12.19.11

CURRENCY

COIN

TOTAL FROM OTHER SIDE

SUBTOTAL

LESS CASH RECEIVED

PLEASE SIGN IN TELLER'S PRESENCE FOR CASH RECEIVED.

**Bank of America**

⑆510000354⑆

Checking Deposit

T.K. PROPERTIES
TAE K. KAI
PO BOX 3136
SAN JOSE, CA 95156

4921

11-35/1210
679

March 10, 2012
Date

Pay to the
Order of _HAWAIIAN RIVERBEND LLC_ | $ 3,000.⁰⁰

_Three Thousand exactly_ _____ Dollars

**Bank of America**
McKee-Toyan
3491 McKee Rd
San Jose CA
408.983.0688

Customer Since
1984

For _01 427- 75106_

⑆121000358⑆4921 ⑈06794⑈4117⑈

---

| 0 | 1 | 4 | 2 | 7 | – | 7 | 5 | 1 | 0 | 6 |
ACCOUNT NUMBER

Confidential

**Checking Deposit**

NAME (PLEASE PRINT) _Hawaiian Riverbend LLC_
ADDRESS _725 N. Santa Cruz Ave_
CITY _Los Gatos_ STATE _CA_ ZIP CODE _95030_
DATE _3-10-12_

PLEASE SIGN IN TELLER'S PRESENCE FOR CASH RECEIVED.

| | LIST CHECKS BY BANK NO | DOLLARS | CENTS |
|---|---|---|---|
| CURRENCY | | | |
| COIN | | | |
| CHECKS | | 3,000 | — |
| TOTAL OF CHECKS LISTED ON REVERSE SIDE | | | |
| SUBTOTAL | | | |
| ◄ LESS CASH RECEIVED | | | |

**Bank of America**

Bank of America, N.A. • Member FDIC

TOTAL DEPOSIT $ 3,000.⁰⁰

⑆510000354⑆

T.K. PROPERTIES
TAE K. KAI
PO BOX 3136
SAN JOSE, CA 95156

5047

11-35/1210
679

May 11, 2012 Date

Pay to the
Order of    HAWAIIAN RIVERBEAD, LLC | $3,000.00

Three thousand etc city _____ Dollars

Bank of America
McKee-Toyan
3491 McKee Rd
San Jose CA
408.983.0588

VALUED Customer Since
1984

For    01427-75106

⑈121000358⑈5047‴06794‴4114⑈7‖

---

| 0 | 1 | 4 | 2 | 7 | - | 7 | 5 | 1 | 0 | 6 |
ACCOUNT NUMBER

Confidential          **Checking Deposit**

HAWAIIAN RIVERBEAD LL
NAME (PLEASE PRINT)
P O  BOX 3181
ADDRESS
SARATOGA, CA   95070
CITY          STATE        ZIP CODE
DATE  5-11-12

| | | LIST CHECKS BY BANK NO. | DOLLARS | CENTS |
|---|---|---|---|---|
| | CURRENCY | | | |
| | COIN | | | |
| | CHECKS | | 3 000 | 00 |
| | TOTAL OF CHECKS LISTED ON REVERSE SIDE | | | |
| | SUBTOTAL | | | |
| | ◄ LESS CASH RECEIVED | | -0- | |

PLEASE SIGN IN TELLER'S PRESENCE FOR CASH RECEIVED

Bank of America

Bank of America, N.A. • Member FDIC

TOTAL
DEPOSIT  $ 3,000.00

⑈510000354⑈

7 am   Agreed Disbursement for $69,000

15            Date

30          1/11/13

45   The Parties : Tacot Kai

8              Michael Niroyan

15   re: Kai's obligation HR LLC

30        membership purchase Og

45        and $ rolled into existing 1st

9    mortgage. TMK# 6-8-02-21

15

30        In consideration for the $69,000

45   paid as follows

10   1) $20,000 pd. on 1/11/13

15   2)  19,000 pd. 2/11/13

30   3)  17,000     3/11/13

45   4)  15,000     4/11/13

11

15        It is agreed amongst the

30   above the parties that new

45   1st mortgage amount

12   of $820,000 is now going

15   to $840,000 in favor of

30   the Kais to be paid by Niroyan

45   through refi. by July 15 2013.

1    w/ normal default periods if

15   not paid on time. This mortgage

30   and agreement subject to Kai's pt pmt

45   of # 1-4 above. We agree
              Niroy—

AT-A-GLANCE®

Exhibit "E"

| | |
|---|---|
| **From:** | michael Miroyan [mac8881@me.com] |
| **Sent:** | Sunday, June 02, 2013 5:35 PM |
| **To:** | usa0288@FedEx.com |
| **Subject:** | Fwd: Hawaiian Riverbend capital call for Sid Fuke |
| **Attachments:** | SCAN_DOC0001.PDF; ATT00021.htm |

Sent from my iPhone

Begin forwarded message:

**From:** michael Miroyan <mac8881@me.com>
**Date:** June 2, 2013, 3:20:06 PM PDT
**To:** Tae <taehyuga@yahoo.com>, Tae <kaiortho@sbcglobal.net>
**Subject: Fwd: Hawaiian Riverbend capital call for Sid Fuke**

Dear Tae and Dr. Ken,
        This email from way back in September 2012 still has not been paid. this is an example of the breach on your part where we couldn't even pay Sidney yet after all her did for us because you were not forthcoming with these monies.

 Not only that but you,Tae, avoided me for months and I don't think unless I caught you and showed you The obligations on your side based on our membership purchase agreement .....that you wouldn't talk to me and  you were trying to never pay Your fair share obligations once the project was approved as is called for in our membership purchase agreement.

 If you could have Gotten away with it, I believe you would not have paid your obligations even though you knew it was your responsibility to do so once the project was approved.

You knew you had these obligations .... How else would your 1st Mortgage and your note go from $540,000 to $615,000?

I am sorry to say that I do believe you knew exactly what your obligations were and that's why you were so hard to get a hold of.

You wasted a lot of my time and you have damaged me these many months since our approval on November 16, 2012.

Im sure you knew what was required of you  all along, But because of other financial difficulties or constraints as was obvious by the way you spread payment out over   three months, you chose the course of action less honorable .

I can understand your predicament and I can understand your decision even though it was wrong. However , I have never chose that course of action and I've been down so much more harder than you, you never know.

When I look at your accounting, I have some questions .and I expect my questions to be met civilly with simple answers in a very short period of time because I'm done messing with this whole thing....

I have no more time for games and I tell you this : you have taken your last liberty that you can and should take . I will allow no more.

Exhibit "F"

In regards to Pattison going to pushing Mr. Sullivan to include $2.1 million which by no means all went to Patterson Village is pushing me to enter into an illegality which I will not allow, But because you figure you are covered .... Which is a mistake ; because you know all that money did not go to Patterson Village it would be inaccurate reporting, but because you figure you are covered, you do not care ..... Who else may get in trouble for this inaccurate accounting ......for it will only be me.

Now ,this is the third Violation and it is in my opinion, the most insidious because it constitutes a possible criminal act which shows the utter and total disregard that you have for me .

Not paying Sidney Or our other consultants or our property taxes as you were supposed to since last July, 2012 's Capital call, not paying for over a year and being in breach for over a year .....dodging me on your obligations from our membership purchase agreement.... Not supplying me with the note .....making me dig through the ashes of my house to find it .....that was crazy .......but it's nothing like putting me in harms way ,which I will not allow you to do.

Anybody else with less patience and less control would be very mad at the landscape of the last 12 months and would renege on their obligations for they don't have to pay you anything but they are not Michael Miroyan

Sent from my iPhone

Begin forwarded message:

**From:** michael Miroyan <mac8881@me.com>
**Date:** September 11, 2012, 11:24:39 PM PDT
**To:** Undisclosed recipients: ;
**Subject: Fwd: Hawaiian Riverbend capital call for Sid Fuke**

**Subject: Fwd: Hawaiian Riverbend capital call for Sid Fuke**

Dear Tae and Dr. Ken Kai.,           9/11/12

Dear Waikaloa Mauka ,
            Enclosed find the bill for Mr. Sydney  Fuke. It is for this reason I am calling  a capital call of $4000 per side to pay Mr. Fuke's bill . As we all are aware Mr.Fuke's  assistance has been instrumental and absolutely essential in the processing of our subdivision and the rezoning of our property.
 please remit your $4000 to the Bank of America Hawaiian Riverbend account prior to September 15 .
thank you very kindly .

Respectfully yours,
Michael Miroyan

Mgr, HR, Llc

Begin forwarded message:

> **From:** michael Miroyan
> **Date:** September 11, 2012 8:46:31 AM PDT
> **To:** FukeSid Sidney M
> **Subject: Fwd: Hawaiian Riverbend**
>
> Got it,Sid.  Give me a couple weeks ,please.m
>
> Sent from my iPad

> **From:** Sid Fuke
> **Date:** September 8, 2012 12:21:51 PM PDT
> **To:** 'michael Miroyan' <mac8881@me.com>
> **Subject: Hawaiian Riverbend**
>
> Mike;
>         Attached is my billing to date re: the subject matter.  I would appreciate your processing of this.  It is going to be rather involved and rough sledding moving forward, so I would appreciate your making due on this.  Thank you!
> Sid
> p.s.  As you work with the WVA, please note (as you already know) that you need the WVA more than it needs you.



**SidneyFuke**, Planning Consultant

100 Pauahi Street, Suite 212 • Hilo, Hawaii 96720
Telephone: (808) 969-1522 • Fax: (808) 969-7996
E-mail: sidfuke@hawaiiantel.net

• Planning • Variance • Zoning
• Subdivision • Land Use Permits
• Environmental Reports

**DATE:** September 8, 2012

**TO:** Mr. Michael Miroyan
HAWAIIAN RIVERBEND, LLC

**FROM:** Sidney Fuke

**RE:** Waikoloa Commercial Rezoning Project – TMK: 6-8-02: 21 por

## Planning Consultant Services

Prepare and process State Land Use (Ag to Urban) and County Rezoning (A-5a to CV-20) applications - $30,000 plus expenses and taxes

| | | |
|---|---|---|
| 1. Retainer - $10,000 (paid) | | |
| 2. Upon submittal of Application | $ 10,000.00 | |
| Less payment received ($5,000) | ($ 5,000.00) | |
| 3. Upon Planning Commission Hearing - $ 5,000.00 | | |
| 4. Upon Final Council Action - $ 5,000.00 | | |

## Reimbursable Expenses

Printing - $131.75
Postage and tax clearance- $16.50
Sign - $100.00
Surrounding property owner notification – $1,378.98
Mileage (Waikoloa/Hilo) - $.51 x 140 = $71.40          $ 1,698.63

## State Excise Tax (4.166%) – includes past payments          903.96

| | | |
|---|---|---|
| **Amount Due This Period** | $ | 7,602.59 |
| **Amount PAST Due** | $ | .00 |
| **TOTAL AMOUNT DUE** | $ | 7,602.59 |

# HAWAIIAN RIVERBEND, LLC MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement, hereinafter referred to as the "Agreement", is effective as of June__, 2013, by and between **TAE KAI and KENNETH KAI, as Trustees of the Kai Family Trust,** (hereinafter referred to as the **"Seller"**), and **MICHAEL MIROYAN,** (hereinafter referred to as the **"Purchaser"**) at Los Gatos, California. As hereinafter set forth, **HAWAIIAN RIVERBEND, LLC,** (hereinafter referred to as **"Company"**) is an interested party as to portions of this Agreement, and to the extent applicable, also is a party hereto.

## Recitals

**WHEREAS, Seller** is currently the owner of one half of all Limited Liability Company interests, representing fifty (50%) percent of the issued and outstanding membership interests of **Company**; and

**WHEREAS,** Seller desires to sell all of their membership units of the membership interests they own to **Purchaser,** representing Fifty (50%) percent of the outstanding and issued membership interests, and **Purchaser** desires to purchase such interest from **Seller** on the terms and conditions hereinafter set forth:

**NOW, THEREFORE,** the parties hereto agree as follows:

1. *Purchase and Sale of Membership Interests.*

1.1. *Purchase.*    Subject to the terms and conditions of this Agreement, **Seller** hereby agrees to sell, transfer, assign, and deliver to **Purchaser** fifty units of membership interests in Company (the "Interests"), consisting of Fifty (50%) percent of the issued and outstanding

1

Exhibit "G"

Interests, and **Purchaser** agrees to purchase from **Seller** the Interests, all in accordance with the following plan.

      1.2.   *Consideration on Purchase.*   The purchase price for the Membership Interest shall be paid as follows:

      A.   *Mortgage Agreement* . The **Seller** currently holds a first mortgage against Company's real property in the principal sum of $540,000. **Seller** agrees to modify the mortgage loan to increase the principal debt owing thereunder to $840,000, and secure it against the 14.6 acres commercial parcel desigated as TMK (3) 6-8-002-053, releasing two other parcels of Company's property. The new mortgage loan will become due and payable on November 1, 2013, with a thirty day grace period after notice of default. When such mortgage debt is paid, $232,000 of the principal to b e paid shall be construed as the purchase price paid for **Seller**'s membership interest, with the balance of the mortgage debt payoff ($608,000) to apply against **Purchaser'**s and Company's remaining obligations to **Seller**. The $540,000 original first mortgage, when replaced by the new $840,000 mortgage will be reconveyed to Company.

      B.   *Cancellation of Indebtedness*. Any and all existing indebtedness of **Purchaser** to **Seller** in the form of personal loans, interest obligations, debts for reimbursement arrangements, obligations for all past joint venture, partnership, or other real estate development plans, including, but not limited to the Miroyan Ranch (269 acres in Patterson, California), Sperry Road Business Center LLC, Patterson Village LLC, Altadena Lane LLC bond posting, and any other venture will be forgiven and cancelled in conjunction with this sale of **Seller**'s membership interests in Company. The sole exception to this cancellation of any and all indebtedness of **Purchaser** is with regard to the sum of $281,000 which **Purchaser** shall endeavor to pay back to **Seller** on the following terms: Upon receipt by **Purchaser** of $1,000,000 in income for himself from the Company's project, after

2

repayment of loans, debts to attorneys and to Stefan Martirosian, the balance of funds will be allocated proportionately among **Seller** as to a one-quarter share and **Purchaser** as to a three-quarter share, and this obligation shall be binding on **Purchaser**'s heirs and assigns. This $281,000 obligation shall be paid to **Seller** on or before August 1, 2015, and if not so paid, shall accrue interest at 5 percent per annum from June 19, 2013. This obligation shall be paid down earlier than August 1, 2015 upon the occurrence of the following events: a) If there is a prior sale of the 5.95 acre parcel designated as TMK (1)6-8-002-021, then the net sale proceeds shall be shared with 75% paid to **Seller** and 25% retained by **Purchaser**; b) If an agreement is negotiated with a True Value Hardware franchisee for the future development acquisition of any lot from the 14.622 acre parcel, then any funds paid for those rights shall be shared with 65% paid to **Seller** and 35% retained by **Purchaser**.

2.        *Closing.*

2.1.    *Closing Date.* The closing of the purchase and sale of the Interests (the "Closing") shall be held at such time as the $840,000 new mortgage on the Company's property in favor of **Seller** is paid off and cancelled.. The date of the Closing is hereinafter referred to as the "Closing Date", and shall be endeavored to be met by December 1, 2013, whereupon the membership interests will be transferred and assigned to **Purchaser**.

2.2.    *Obligations at Closing.*        On the Closing Date, or on such other date as consummation of the purchase and sale of Interest described in this may be delayed by verbal agreement of the parties, at the closing place specified in this Agreement:

(a)    **Purchaser** shall deliver to **Seller** the remaining consideration to be paid for the Membership Interests being acquired herein; and

(b)    **Seller** shall acknowledge to **Purchaser Seller**'s cancellation of **Purchaser**'s other obligations and debts to **Seller**, with the exception of the $281,000 debt excluded therefrom and hereinabove addressed in Section 1.2 B.

3.    ***Additional Terms.***

3.1.    *Entire Agreement; Amendment.*    This Agreement constitutes the full and entire understanding and agreement between the parties and reflects the agreement previously signed by the parties with respect to the subject hereof.  Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated verbally, but only by a written instrument signed by the party against whom enforcement of any such amendment, waiver, discharge or termination is sought. In the event of any conflict between the terms of this Membership Interest Purchase Agreement and the Company's Operating Agreement, this Agreement shall be given priority and its terms and conditions shall be enforced to the extent necessary, notwithstanding the terms of the Operating Agreement.

3.2. *Notices.*    All notices permitted or required under this Agreement shall be, in writing, and shall be deemed delivered when delivered in person, or if mailed, when deposited in a mail box, first class, registered or certified mail, postage prepaid, to **Seller** at P.O. Box 3136, San Jose, CA 95156, or to **Purchaser** at P.O. Box 3181, Saratoga, CA 95070, or such other address which a party may provide by notice in conformity herewith.

3.3.    *Waiver.*    The waiver of one breach or default or any delay in exercising any rights shall not constitute a waiver of any subsequent breach or default.

3.4.    *Attorney's Fees.*    If either party brings any suit, action, counterclaim, or arbitration to enforce or interpret the provisions of this Agreement, the prevailing party therein shall be entitled to recover a reasonable allowance for attorneys' fees and litigation expenses in addition

to Court costs. "Prevailing party" within the meaning of this Section includes without limitation a party who agrees to dismiss an action or proceeding upon the other's payment of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief it seeks.     3.5.  *Governing Law.*     The rights and obligations of the parties shall be governed by, and this Agreement shall be construed and enforced in accordance with, the laws of the State of California.

   3.6.  *Additional Actions and Documents.*   The parties shall execute and deliver such further documents and instruments and shall take such other and further actions as may be required or appropriate to carry out the intent and purpose of this Agreement, as in the original note for $540,000 signed by Purchaser to be cancelled as a result of the new promissory note which incorporates the terms of the old note and supercedes it.

   3.7. *Binding on Successors and Assigns.*   This Agreement shall be binding on the parties hereto, their respective heirs, executors, administrators, successors and assigns.

   3.8 *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same document. In all respects a faxed document which evidences the signature of a party hereto shall be as effective as the original document which manifests the actual signature of the party.

   **IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date set forth above.


                                 **PURCHASER**

**DATED:**

                                 _____
                                 **MICHAEL MIROYAN**

**SELLER**

**DATED:**

_____
**TAE KAI**


_____
**KENNETH KAI**



**COMPANY**

**HAWAIIAN RIVERBEND, LLC**

**BY:**_____
    **MICHAEL MIROYAN, Manager**

# HAWAIIAN RIVERBEND, LLC AMENDMENT TO OPERATING AGREEMENT

This Agreement amends the Operating Agreement heretofore entered into by and between the parties, and is effective as of August        , 2013, by and between **TAE KAI and KENNETH KAI, as Trustees of the Kai Family Trust,** (hereinafter referred to as **"Kai"**), and **MICHAEL MIROYAN,** (hereinafter referred to as the **"Miroyan"**) at Santa Clara County, California.  As hereinafter set forth, **HAWAIIAN RIVERBEND, LLC,** (hereinafter referred to as **"Company"**) is an interested party as to portions of this Agreement, and to the extent applicable, also is a party hereto.

## Recitals

**WHEREAS, Miroyan** and **Kai** are all of the Members of the Company, and each is the owner of Limited Liability Company interests representing fifty (50%) percent of the issued and outstanding membership interests of **Company**; and

**WHEREAS**, the Parties desire to supplement the Company's Operating Agreement with regard to management and operation of the Company, and desire to state their present intentions with regard to financing capital for the Company's planned operations and development of Company's real property in Waikoloa, Hawaii on the terms and conditions hereinafter set forth:

**NOW, THEREFORE,** the parties hereto agree as follows:

1.        **Kai's** modified mortgage of $840,000 which is now secured by the 14.6 acres parcel designated as TMK (3) 6-8-002-053 will be partially paid down by **Miroyan** at such time as the 5.95 acres parcel designated as TMK(1)6-8-002-021 is sold by Company. The Company is placing a $150,000 first mortgage against that 5.95 acre parcel 21.  When sold, the parties agree that 80% of

1

Exhibit "H"

the net proceeds of the sale of parcel 21 (after the first mortgage of $150,000 is paid off and escrow

costs and brokers' fees are paid) will be applied to pay down the $840,000 mortgage held by **Kai**.

The Company will be entitled to the remaining 20% of net proceeds free of any claim of **Kai**. Upon

receipt by **Kai** of the 80% share of net proceeds from the sale escrow on the 5.95 acre parcel 21, the

$840,000 first mortgage on the 14.6 acres parcel 53 will be modified to reflect such payment.

*Upon full payment of the $840,000 the Kai's membership interests in HRLLC reve... MMiro...*

2. This agreement will serve as irrevocable escrow instructions with regards to the

disbursement of sales proceeds upon the sale of parcel 21.

*(MM) 8/9/*

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the

date set forth above.

*As a result of this agreement which reconciled this busi... venture and others between M Miroyan and Tae & Ke...*

DATED: 8/9/13

*it is agreed there is no other funding or any request of any kind for funding, cap calls for future monies of any kind from the Kais for their obligation on all fronts and in all business ventures have been 100% satisf... and no further request will be tolerated.*

_____
**MICHAEL MIROYAN**

_____
**TAE KAI**

_____
**KENNETH KAI**

**COMPANY**

**HAWAIIAN RIVERBEND, LLC**

BY: _____  8/9/13
**MICHAEL MIROYAN, Manager**

2

The Reconciliation Summary

as of 8/3/13 between KAI's &

Michael Miroyan is as follows:

**K-1 PV,LLC NW PATT LLC** 1) KAI's to receive K-1's for PV in amt. of $2,088,000. prior to Sept 15, 2013 and by 8-21-13 if feasible.

**K-1's SRBC** 2) KAI's to receive K-1 for their SRBC INV. in amt of $420,000 prior to Sept 15, 2013 and by 8-21-13 if feasible.

2A) * M. MIROYAN to pay for prep. of K-1's

2b * if penalties are Req'd/MANDATED/ by St. Franch Tax Bd. for PV/ NW PATT LLC's those penalties are to be

**or not paying annual filing fees timely** PAID by KAI's

* if penalties same as 2b are assessed and req'd for SRBC those penalties are to be paid on a prorate basis for SRBC based on K-1's. I.E. KAI's @ $420K MM @ $1,680,000 ... then MM responsible for 80%, KAI's responsible for 20% ..... etc

3) MM to sign 1st mortgage $840,000 w/int pd. thru 1/15/14 due date which includes 30 day grace period from 12/15/13

4) KAI's release mortgage from "5.95 acres" @ demand on TMK: 6-8-02-21 and will likewise release mortgage on the "Park Parcel" TMK #6-8-02-52 w/ @ demand and all parties agree the $740,000 existing 1st mortgage of HR, LLC's shall become and has become $840,000 to be secured in 1st position on TMK#: 6-8-02-53, the 14.6 acres of Commercially zoned property.

4A) Within this agreement to increase the 1st mortgage to $840,000, it is agreed amongst the parties that of that $840,000, $190,000 is accrued interest and the KAI's will be 1099'ed for that amount upon pay off in full by HR, LLC projected to be in Oct/Nov. 2013 but in any event no later than Jan 15, 2014 which includes a 30 day NOD period from Dec. 15, '13 to Jan 15, 2014.

4b) It is further agreed amongst the parties that HR, LLC shall be allowed to encumber the 5.95 acre parcel TMK #6-8-02-21 w/ a 1st mortgage not to exceed $150,000 so as to have access to some of its equity.

(A) 5) After the 1st mortgage occurs, MMinoyan is to attempt to vigorously settle the Altalena $12,000 lawsuit by paying up to $9000 and paying that amount in full w/ his own funds. If an answer to complaint has to be filed, the KAI's will pay filing fee of $325 as well MM & RM but MM is responsible for all pleadings on behalf of KAI's and for settlement of same at no further cost to KAI's unless settlement is over $10,000 at which time the parties can agree.

new mortgage 6) The parties agree that MM shall sign & execute a 2nd mortgage on 8/3/13 in favor the KAI F. Trust in the amount of $300,000 secured by the same real property as the

$840,000 1st mortgage with the understanding that this second mortgage w/ interest accruing @ 5% annually and running for a term of 30 months maximum + maximum interest @ 5%/yr = $15,000/yr × 2.5 = $37,500 for a total maximum loan indebtedness to HR LLC in the amount of $337,500 on the due date of 3/31/16) ... With the understanding that this 2ND mortgage accruing interest shall subordinate to 2 first mortgages, prior to payoff.

## Promissory Note

$300,000.00

Hawaiian Riverbend, LLC does hereby promise to pay to the Kai Family Trust the $300,000 note + 5% interest after 2 subordinations w/ 30 months

MR RYAN

Sent MM iPhone

Begin forwarded message:

**From:** Michael Miroyan <mac8881@me.com>
**Date:** April 26, 2015 at 11:34:42 PM PDT
**To:** Tae <kaiortho@gmail.com>, Tae <taehyuga@yahoo.com>
**Subject: Treachery Deceit & Fraud**

It is my position that the note and the mortgage interest showed it's all been taken under fraudulent conditions in improper business practices on your part,that were not truthful nor open for me to even see where you were going with this until just today and yesterday when it all of a sudden dawned on me that although I've been trying to make it right and be an honorable and good friend and Business associate, but shouldering these financial responsibilities as I feel I should on my own shoulders although I've not have to do it legally bylaw but I wanted to do it but I sure didn't want to do it this way... Now to find out that you've been conniving and conspiring lying cheating all with the endgame in mind to kill me & my money in Hawaii in the assets HR owns and that this whole time your dishonesty and subterfuge has been aimed at the stealing of that property with my demise in your mind and heart at all times... All I can say is I'm very hurt and very upset I'm very shocked and I can't believe that you were going to this extent for the last three years and therefore all bets are off ....no wonder you didn't get around to extending formally the mortgage to at least December of 2015 as we had agreed and we signed the paper saying so.....I was to have time.... not to be put under the pressure cooker again ....because you 2 wasted 10 months... Where you made it virtually impossible to meet with you...& it took forever in coming to a resolution on something that should've not taken long at all had it not been for your false accounting , $200,000 wrong at all on your side and only produced at the end of May '13 for which I got one meeting between January '13 and June of '13 and that was in June '13 where I pointed out your "mistakes " by mis-charging $200,000 to your bottom line for yourselves.... And for a few other greaseball moves that I'm not going into at this time.

Had it Not been for your endless games, subterfuge, chicanery...& lies ..... If you have not been pursuing this secret agenda as a separate and secret game plan we wouldn't of wasted 10 or 12 months in the deal like you should have ... Our improvements most likely would have been done by now...

Its always been my/our plan that when the improvements are ready to be built, including the road to the park...that at that Time we would endeavor to take out the first mortgage and .... Pay off the first not the second... Because HR will have to borrow a considerable amount of money for those on and off-site
improvements.

We have talked with the bank of Hawaii and Miss Crawford said she wants to do that because they want to carry the paper on the shopping center...

If there is any further disruption by you Kais whose conduct for the past three years has been full of deceit, dishonor and fraudulent business dealings ....w/ me and this project that is certainly the case and you have significantly damaged me & this shopping center project w/ your treacherous games and hurtful actions ; so I tell you, straight up.... If you file a notice of default if you do not scan down and sign that which we agreed to in the term of the length of our first mortgage then I will bring all of this into a court of law and expose it for what it actually is ...and I will file a cross complaint lawsuit for no less than $10 million which is a low number compared to what you're trying to do to me and what you've cost me and lost time feel like a fool for doing the right thing while you been led by counsel all the way through and lying to me all the way through.

If you're smart and I hope you are you'll turn from this imprudent course of action sign the extension in the note as we already have on another piece of paper to the end of this year and wait patiently for me to pay you the entire amount of your first mortgage which I don't believe Scott happen if we go to court because I don't owe certain things that I put in there knowing

*Exhibit "J"*

that you're cheating on me the whole time which like for example the $19,000 I put in there as extra interest just rounded up or the fact that I lost my ranking is foothills of San Jose because of this happy horseshit you guys were playing on me and not being able to prepare properly nor have the money to do so....

And then there's the stress and aggravation factor in emotional damages in pain and suffering to know that it was done all along in a preconceived effort because nothing is ever enough for you... Well you probably save yourself a lot of grief and aggravation by standing down because if you don't I just get real ugly and I'm motivated to do just that because you have burned me knowingly willingly and freely and I've never ever done that to you! '!

Very truly yours,
michael miroyan, manager/member, Hawaiian Riverbend,Llc

Sent MM iPhone